## UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF KENTUCKY
## BOWLING GREEN DIVISION

**CIVIL ACTION NO. 1:10CV-00122-JHM**

**SCA HYGIENE PRODUCTS AKTIEBOLAG and**
**SCA PERSONAL CARE, INC.**                                                              **PLAINTIFFS**

**v.**

**FIRST QUALITY BABY PRODUCTS, LLC,**
**FIRST QUALITY HYGIENIC, INC.,**
**FIRST QUALITY PRODUCTS, INC., and**
**FIRST QUALITY RETAIL SERVICES, LLC**                                 **DEFENDANTS**

### CLAIMS CONSTRUCTION MEMORANDUM OPINION AND ORDER

Plaintiffs SCA Hygiene Products Aktiebolag and SCA Personal Care, Inc. (collectively

"SCA") filed this case alleging that Defendants First Quality Baby Products, LLC, First Quality

Hygienic, Inc., First Quality Products, Inc., and First Quality Retail Services, LLC (collectively

"First Quality") infringe the asserted claims of U.S. Patent No. 6,375,646 and its accompanying

Reexamination Certificate (collectively "the '646 Patent").  First Quality has filed a counterclaim

against SCA alleging claims of noninfringement and patent invalidity.

"A court's first task in determining whether an accused device or process infringes a patent

is to construe the claims to ascertain their proper scope." Rogers Indus. Products, Inc. v. HF Rubber

Machinery, Inc., 797 F. Supp. 2d 851 (N.D. Ohio June 17, 2011)(citing Lockheed Martin Corp. v.

Space Systems/Loral, Inc., 324 F.3d 1308 (Fed. Cir. 2003)).  Accordingly, on December 29, 2011,

the Court conducted a hearing pursuant to Markman v. Westview Instruments, Inc., 517 U.S. 370

(1996).  Prior to the hearing, the parties submitted a Final Joint Claims Construction Statement [DN

51], claims construction briefs [DN 52, DN 53], and response briefs [DN 58, DN 59]. Upon

consideration of the parties' briefs and arguments, the Court construes the disputed terms as set forth

herein. This opinion does not address the merits of the patent infringement claim or any of the

counterclaims.

## I.  STANDARD OF REVIEW

"It is a bedrock principle of patent law that the claims of a patent define the invention to which the patentee is entitled the right to exclude." Phillips v. AWH Corp., 415 F.3d 1303, 1312 (Fed. Cir. 2005) (internal quotation marks omitted). The terms of a patent claim are to be given the ordinary and customary meaning from the perspective of a person of ordinary skill in the art at the time the patent is filed.  Chamberlain Group, Inc. v. Lear Corp., 516 F.3d 1331, 1335 (Fed. Cir. 2008). "[T]he person of ordinary skill in the art is deemed to read the claim term not only in the context of the particular claim in which the disputed term appears, but in the context of the entire patent, including the specification." Phillips, 415 F.3d at 1313.

When construing claim terms, the court should first look to sources in the intrinsic record. Gen-Probe Incorporated v. Becton Dickinson and Co., 2011 WL 5553783, *1 (S.D. Cal. Nov. 15, 2011)(citing Vitronics Corp. v. Conceptronic, Inc., 90 F.3d 1576, 1582 (Fed. Cir.1996)).  First, "'the claims themselves provide substantial guidance as to the meaning of particular claim terms.'" Id. (quoting Phillips, 415 F.3d at 1314). Second, the claims "must be read in view of the specification, of which they are a part." Id. (quoting Phillips, 415 F.3d at 1315).  The specification is usually "dispositive," as "it is the single best guide to the meaning of a disputed term." Id.  Third, "a court should also consider the patent's prosecution history."  Phillips, 415 F.3d at 1317.  The prosecution history consists of the complete record of proceedings before the Patent and Trademark Office ("PTO") and "includes the prior art cited during the examination of the patent." Id.

The patent's prosecution history "can often inform the meaning of the claim language by demonstrating how the inventor understood the invention and whether the inventor limited the invention in the course of prosecution, making the claim scope narrower than it would otherwise

be." Phillips, 415 F.3d at 1317.  However, "because the prosecution history represents an ongoing negotiation between the PTO and the applicant, rather than the final product of that negotiation, it often lacks the clarity of the specification and thus is less useful for claim construction purposes." Id.; see also Gen-Probe Incorporated, 2011 WL 5553783, *1.  "To balance the importance of public notice and the right of patentees to seek broad patent coverage, [courts] have thus consistently rejected prosecution statements too vague or ambiguous to qualify as a disavowal of claim scope." Omega Engineering, Inc. v. Raytek Corp., 334 F.3d 1314, 1325 (Fed. Cir. 2003)(citing Schwing GmbH v. Putzmeister Aktiengesellschaft, 305 F.3d 1318, 1324-25 (Fed. Cir. 2002) ("[P]rosecution history . . . cannot be used to limit the scope of a claim unless the applicant took a position before the PTO that would lead a competitor to believe that the applicant had disavowed coverage of the relevant subject matter.")).   "Moreover, where a statement is subject to multiple reasonable interpretations, at least one of which would not amount to a surrender of claim scope, as a matter of law, prosecution history disclaimer is not applicable."  USHIP Intellectual Properties, LLC v. United States, ___ Fed. Cl. ___, 2011 WL 6937460, *1 (Fed. Cl. Dec. 29, 2011).  "Consequently, for prosecution disclaimer to attach, our precedent requires that the alleged disavowing actions or statements made during prosecution be both clear and unmistakable." Omega Engineering, 334 F.3d at 1325-26.  See also  LSI Industries, Inc. v. ImagePoint, Inc., 279 Fed. Appx. 964, 969 (Fed. Cir. 2008).

If ambiguities in the claim terms remain after consulting the intrinsic evidence, courts may consider extrinsic evidence. Vitronics, 90 F.3d at 1584. Extrinsic evidence includes "expert and inventor testimony, dictionaries, and learned treatises." Phillips, 415 F.3d at 1317.

## II. DISCUSSION

The invention described in the '646 Patent was developed by engineers at SCA's Swedish

3

research laboratories and relates to a pants-type disposable diaper for use by both potty-training children and adults with incontinence issues.  The inventors filed an initial patent application in Sweden on March 4, 1992, and the '646 Patent issued in the United States on April 23, 2002, with claims 1-28.  Claims 29-38 were added during a reexamination which concluded on March 27, 2007. Claims 1 and 15 are independent claims and the remainder of the claims depend from either claim 1 or 15.

Claims 1 and 15 of the '646 Patent contain identical preambles, both requiring a pants-type diaper with a front part having side edges and an end edge; a back part having side edges and an end edge; a crotch part between the front and back parts; at least two side-closure parts which mutually join parts of the side-edges of respective front and back parts, so that the pants-type diaper will present a waist opening and two leg openings; an elongated absorbent layer having a front and a rear end part and an intermediate central part; an inner casing layer placed on that side of the absorbent layer which is tended to face towards a wearer; and an outer casing layer which is placed on the other side of the absorbent layer.  ('646 Patent, col. 8, 48-col.9, 13; col. 10, 6-39.)  The majority of the claim terms in dispute are located in independent claims 1 and 15.  Claim 1 provides in relevant part that

> the pants-type diaper further comprises at least one elastically stretchable region covering essentially the whole of at least one of the respective front and back parts; the crotch part being essentially non-stretchable in relation to said stretchable region; at least one of the respective end parts of the absorbent layer being disposed within one of said elastically stretchable regions; the central part of the absorbent layer being disposed within the relatively non-stretchable crotch part of the diaper; and at least one of the stretchable regions being disposed on the side of the absorbent layer facing away from the inner casing layer, whereby those forces that are exerted by the elastically stretchable region on at least one of the end part of the absorbent layer function to hold the absorbent layer in sealing abutment with the wearer when the pants-type diaper is worn.

('646 Patent, col. 8, 64- col. 9, 13.)  Similarly, claim 15 provides that

4

at least one of the respective front and back parts has at least one elastically stretchable region; the crotch part being essentially non-stretchable in relation to said stretchable region; at least one of the respective end parts of the absorbent layer being disposed within one of the respective end parts of the absorbent layer being disposed within one of said elastically stretchable regions; the central part of the absorbent layer being disposed within the relatively non-stretchable crotch part of the diaper; and at least one of the stretchable regions being disposed on the side of the absorbent layer facing away from the inner casing layer, whereby those forces that are exerted by the elastically stretchable region on at least one of the end part of the absorbent layer function to hold the absorbent layer in sealing abutment with the wearer when the pants-type diaper is worn; and at least one of the end edge of the front and the back parts has at the waist opening of the pants at least one elastically stretchable waist part whose stretching and contraction power is greater than the remainder of the stretchable region.

('646 Patent, col. 10, 21-39.)

The parties have identified six claim construction issues contained in the '646 Patent in claims 1-11, 15-25, 29-33, and 35-38. The following chart lists the disputed claim terms and phrases and the claims of the '646 Patent in which such terms and phrases are used.

| | Term/Phrase | Claim |
|---|---|---|
| 1 | "elastically stretchable region(s)" **or** "stretchable region(s)" | 1-4,6-7, 10, 15-16, 18-19, 21-22, 30, 32-33 |
| 2 | A. "elastically stretchable region covering essentially the whole of at least one of the respective front and back parts"<br>**or**<br>"stretchable region covers essentially the whole of at least one of the respective front and back parts"<br><br>B. "elastically stretchable regions covering essentially the whole of each of the respective front and back parts" | 1, 35, 37<br><br>17<br><br>29, 31 |
| 3 | "end parts of the absorbent layer . . . disposed within . . . elastically stretchable region(s)" | 1, 15, 33, 35, 37 |
| 4 | "to hold the absorbent layer in sealing abutment with the wearer" | 1, 15 |
| 5 | "separate regions" | 5, 8, 20, 23 |
| 6 | "stretching and contraction power" | 10, 15, 30, 32 |

## A. Construction of "Elastically Stretchable Region(s)" and "Stretchable Region"

The parties propose the following competing constructions of the terms "elastically

stretchable region(s)" and "stretchable region."

| SCA's Proposed Construction | First Quality's Proposed Construction |
|---|---|
| An area (or areas) bounded by elastic elements/material that is capable of being stretched and then, when not stretched, returning to its original form. | An area (or areas) containing stretchable elastic elements or material as illustrated in the figure below by the yellow highlighted areas: |

### 1. Claims and Specification

The language of the claim in question requires the pants-type diaper to have "at least one *elastically stretchable region* covering essentially the whole of at least one of the respective front and back parts." (Id. at col. 8, 65-68 (emphasis added).) Claim 15 also requires, in part, "at least one elastically stretchable region." The '646 Patent specification describes the elastically stretchable region of the diaper by reference to Figure 1 located in the patent.[1] Specifically, the specification



provides that "the front and the back parts 1, 2 of the diaper pants will have regions 29, 30 which are elastically stretchable essentially in the transverse direction of the diaper and which, in the FIG 1 embodiment, coincide essentially with the front and the back parts 1, 2." (Id. at col. 7, 37-41.) The specification further provides that "[i]nstead of elastic bands, ribbons, threads or the like, it is conceivable for the stretchable regions 29, 30 to comprise an elastically stretchable material, for instance an elastically stretchable film, an elastically stretchable non-woven material, laminate, foamed material or the like." (Id. at col. 7, 41-46.)  Contrary to First Quality's argument, nothing in this cited language suggests that the claims require particular spacing and configuration of the elastic elements within the elastically stretchable region.  In fact, the specification clearly states that "[t]he number of elastic elements provided is not restricted to the number shown in FIG.1, and the number of elements 26 may be more or less than that shown."  (Id. at col. 7, 20-22.)  Essentially, the specification of the '646 Patent teaches that the number of elastic threads in the elastically stretchable region, including the spacing of them, can be variable.  Therefore, an examination of the language of the claims and specification of the '646 Patent teaches that "elastically stretchable region" or "stretchable region" means an area bounded by elastic elements and/or material and capable of being stretched.  Thus, the claim and the specification support SCA's construction of the claim term "elastically stretchable region(s)" and "stretchable region."

### 2. Prosecution History

However, the prosecution history of the '646 Patent and the reexamination suggests a narrower meaning of the terms "elastically stretchable region(s)" and "stretchable region(s)."  As discussed above, prosecution history disclaimer narrows the ordinary meaning of the claim only "where the patentee has unequivocally disavowed a certain meaning to obtain his patent[.]"  Omega Engineering, 334 F.3d at 1324.   "The doctrine of prosecution disclaimer 'protects the public's

reliance on definitive statements made during prosecution' by 'precluding patentees from recapturing through claim interpretation specific meanings [clearly and unmistakably] disclaimed during prosecution.'"  Computer Docking Station Corp. v. Dell, Inc., 519 F.3d 1366, 1374 (Fed. Cir. 2008)(quoting Omega Engineering, 334 F.3d at 1323-24).  "Claims should not be construed 'one way in order to obtain their allowance and in a different way against accused infringers.'" Id. (quoting Chimie v. PPG Indus., Inc., 402 F.3d 1371, 1384 (Fed. Cir. 2005) (citation omitted)). However, as discussed above, "for prosecution disclaimer to attach our precedent requires that alleged disavowing actions or statements made during prosecution be both clear and unmistakable." Omega Engineering, 334 F.3d at 1325–26.

During the initial prosecution, the key prior art reference cited was the Japanese prior art reference JP 3,205,053 (the "Honshu Paper").  Figure 12 of the Honshu Paper is shown below:



(SCA-FQ00256522.)  The Patent Examiner initially rejected SCA's claims finding that the Honshu Paper disclosed an elastically stretchable region covering essentially the whole of the front part of the diaper.  (SCA-FQ00256617-18.)   In response to this rejection, SCA submitted a revised translation of the Honshu Paper and argued:

> since the stretchable body 5 is the only elastic part of the waist band, it cannot be fairly stated that the elastic body 5 and the elastic materials 13 together define an elastically stretchable region that covers essentially the whole of at least one of the

> front and back parts of the diaper . . . .  The drawing figures of the Honshu Paper
> clearly show only two narrow strips of elastic 5,5 and 13, respectively, whereas the
> present application shows a continuous region incorporating numerous elastic
> elements 26.

(September 28, 2000, Request for Rehearing, SCA-FQ00256630.)  SCA did not consider the whole

front part of the diaper in the Honshu Paper to be an elastically stretchable area.  In fact, in relying

on a revised translation of the Honshu Paper, SCA indicated that the "separate sheet" between the

elastic waist band 5 and the elastic material 13 in the Honshu Paper was not elastic as originally

defined, but instead described as stretchable in a corrected translation. (SCA-FQ00256629.)  Thus,

to overcome the prior art, SCA argued that an elastically stretchable region that covers essentially

the whole of the front part of the diaper must be "a continuous region incorporating numerous elastic

elements."  (SCA-FQ00256630.)

Adopting SCA's position, the Patent Office Board of Appeals granted the motion for

rehearing stating:

> Without the separate sheet being elastic in the Japanese reference, appellants argue
> (request, page 6) that the Board's conclusion at the end of page 13 of the decision is
> no longer fairly based since the stretchable elastic material 5 and stretchable elastic
> material 13 together cannot be fairly said to define an elastically stretchable region
> that covers essentially the whole of at least one of the front and back parts of the
> diaper . . . .  As perceived by appellants, the Japanese reference shows only two
> narrow strips of elastic 5, 5, and 13 whereas with the present invention a continuous
> region incorporates numerous elastic elements 26.
>
> In light of appellants' commentary and our present understanding of the
> Japanese reference, we share the view that the applied Japanese document does not
> address at least one elastically stretchable region covering essentially the whole of
> at least one of the front and back parts of the pants-type diaper of claim 14.

(July 30, 2001, Decision on Rehearing at SCA-FQ00156659-60.)

Two years after the '646 Patent issued, it was the subject of a reexamination proceeding in the Patent Office at SCA's request.  SCA asked the Patent Office to consider the validity of the '646 Patent in view of a prior art patent, U.S. Patent No. 5,414,649 ("Watanabe").  Figure 3 of the Watanabe patent is shown below:



(SCA-FQ00256917.)  The Patent Examiner initially rejected all of the '646 Patent claims because Watanabe disclosed an elastically stretchable region covering essentially the whole of the front and/or back parts.  In response to the patent rejection, SCA argued that "Figure 3 shows elastic members 8a, 8b of the waist flap and elastic members 16a, 16b spaced from the waist flap and spaced from each other." (March 15, 2006 Reply; SCA-FQ00256869.) SCA noted that "there are clearly significant portions of the front and back parts of the article of *Watanabe et al.* which are not covered by the disclosed stretchable regions. . . . Specifically, applicant's point out the small area of coverage of the body-surrounding elastic members 16a, 16b of the diaper of *Watanabe et al* and, more specifically, the significant gap between the body-surrounding elastic members 16a, 16b and the elastic members 8a, 8b of the waist flap." (Id.)

Significantly, in addition to these statements,  SCA also identified the parts of the Watanabe diaper it considered to be in the elastically stretchable region.  SCA represented to the Patent Office that areas A and C of Figure 3 of Watanabe were the only elastically stretchable regions and that

areas B and D were not elastically stretchable regions because they did not contain elastic. (September 22, 2006, After-Final Reply; SCA-FQ00256902-903.)  SCA identified the particular regions in the figure below:



Specifically, SCA stated:

> In fact, applicants have attached a copy of Figure 3 of *Watanabe et al.* which shows areas A, B, C and D.  Areas A-D constitute the entire front part of the *Watanabe et al.* diaper.  Areas A and C are elastic areas.  Areas B and D do not have elastic areas.  The heights of each of the areas are presented below:

| Area | Height (mm) | Elastic |
|------|-------------|---------|
| A | 4 | Yes |
| B | 5 | No |
| C | 5 | Yes |
| D | 5 | No |

> Accordingly, the front part is 19 mm tall; the elastic areas (A and C) occupy 9 mm; the non-elastic areas occupy 10 mm.  Thus, the elastically stretchable region covers 47.4% (9/19) of the front parts of the diaper shown in Fig. 3 of *Watanabe et al.*  A coverage of 47.4% is not a coverage of essentially the whole.  It is not even coverage of half the area.

(SCA-FQ00256902-903.)

After reviewing the prosecution history, the Court finds that SCA clearly and unmistakably disclaimed its proposed construction of  "elastically stretchable region(s)" and "stretchable region(s)" through statements made during prosecution and reexamination.  During the initial prosecution history, SCA defined an "elastically stretchable region" as a continous region

incorporating numerous elastic elements.  Similarly, during the reexamination, SCA distinguished its design from prior art by noting that the prior art had significant gaps between the elastically stretchable regions which it identified as containing elastic areas.  Contrary to SCA's arguments, to gain approval of the patent, SCA disclaimed any interpretation of "elastically stretchable region(s)" and "stretchable region(s)" as including considerable areas of non-elastic material that are not covered by elastic elements or materials, i.e. gaps.  Therefore, the prosecution history precludes SCA "from regaining, through litigation, coverage of subject matter relinquished during prosecution of the application of the patent." Wang Labs. v. Mitsubishi Elecs. Am., Inc., 103 F.3d 1571, 1577–78 (Fed. Cir. 1997).  See also Graham v. John Deere Co. of Kansas City, 383 U.S. 1, 22 (1966) (holding that claims narrowed to obtain issuance over prior art during prosecution may not subsequently be interpreted by the specification to cover what was disclaimed before the U.S. Patent Office).

Thus, in light of the intrinsic evidence, the Court defines the phrase "elastically stretchable region(s)" and "stretchable region(s)" as: "an area bounded by elastic elements/material incorporating a continuous number of elastic elements/material that is capable of being stretched."[2]

### B. Construction of the "elastically stretchable region covering essentially the whole of at least one of the respective front and back parts" or "stretchable region covers essentially the whole of at least one of the respective front and back parts"

The parties propose the following competing constructions of the terms "elastically stretchable region covering essentially the whole of at least one of the respective front and back parts" or "stretchable region covers essentially the whole of at least one of the respective front and

---

[2]The Court declines to incorporate First Quality's use of pictures in the construction of the utility patent.  The case law reflects that utility patents claims are expressed with words, where the use of pictures has been held appropriate in design patent claims.  See Egyptian Goddess, Inc. v. Swisa, Inc., 543 F.3d 665, 679 (Fed. Cir. 2008).  Defendants fail to offer any persuasive authority otherwise.

12

back parts."

| SCA's Proposed Construction | First Quality's Proposed Construction |
|---|---|
| An area bounded by elastic elements/material that is capable of being stretched and then, when not stretched, returning to its original form, which coincides with substantially the entirety of the front and/or back parts, and having enough elastic elements/material extending transversely across the area to render essentially the whole of the front and/or back parts elastically stretchable, but which does not require the elastic elements/material to cover all or almost all of the area. | An elastically stretchable region covering almost all of at least one of the respective front and back parts, as illustrated below by Figure A, but not by Figure B. Elastically stretchable regions in the below figures are highlighted in yellow and the front/back parts are outlines in red:<br><br>Figure A: "Covering Almost All"<br><br><br><br>Figure B- Not "Covering Almost All"<br><br> |

The language of the claim in question requires that the "elastically stretchable region cover[] essentially the whole of at least one of the respective front and back parts." ('646 Patent, col. 8, 65-68.) Having addressed the meaning of "elastically stretchable region," the current dispute focuses on the meaning of "covering essentially the whole of at least one of the respective front and back

parts." From a review of the claims and the specification, the Court finds that "covering essentially the whole of at least one of the respective front and back parts" means "covering almost all of the front or the back part."

This construction is also consistent with SCA's statements during the reexamination of the '646 Patent. SCA argued that the term "essentially the whole" must be given its plain and ordinary meaning, which it stated would be "almost or substantially the whole." Specifically, SCA stated in relevant part:

> Here, the term "essentially the whole" has not been given a unique meaning by the applicants. Thus, "essentially the whole" must be given its normal meaning as that term would be understood by persons of skill in the art.
>
> A reasonable interpretation of the term "essentially the whole" could be almost or substantially the whole. That is how one skilled in the art reading the claim, in view of the specification, prosecution history and prior art, would reasonably interpret the term "essentially the whole."

(SCA-FQ00256902.)

In an effort to construe the claim broadly, SCA's proposed construction of this term adds the additional clauses: "having enough elastic elements/material extending transversely across the area to render essentially the whole of the front and/or back parts elastically stretchable, but which does not require the elastic elements/material to cover all or almost all of the area." However, SCA's proposed construction directly contradicts the prosecution history. During reexamination of the '646 Patent, SCA specifically represented to the Patent Office that the claim term "elastically stretchable region covering essentially the whole of at least one of the respective front and back parts" required elastic which covered "almost or substantially the whole" of the front or back parts of the diaper. SCA successfully distinguished the Watanabe prior art by arguing that since B and D did not have elastic, Watanabe did not have an elastically stretchable region covering the whole of the front part

14

of the diaper.  In fact, SCA stated that the only elastically stretchable region of the Watanabe prior art was in the elastic areas of A and C.  (SCA-FQ00256902-03).[3]  Under SCA's proposed construction, Watanabe's area B would be considered to be part of the elastically stretchable region because it is bounded by elastically stretchable regions A and C.  However, SCA specifically excluded area B from the elastically stretchable region in distinguishing the Watanabe prior art. (Id.)

Considering the intrinsic evidence, the Court defines the phrases "elastically stretchable region covering essentially the whole of at least one of the respective front and back parts" or "stretchable region covers essentially the whole of at least one of the respective front and back parts" as: "an area bounded by elastic elements/material incorporating a continuous number of elastic elements/material that is capable of being stretched covering almost all or substantially all of the front or the back part."

### C.  Construction of "elastically stretchable regions covering essentially the whole of each of the respective front and back parts"

The parties propose the following competing constructions of the claim term "elastically stretchable regions covering essentially the whole of each of the respective front and back parts."

| SCA's Proposed Construction | First Quality's Proposed Construction |
|---|---|
| Areas bounded by elastic elements/material that are capable of being stretched and then, when not stretched, returning to their original form, which coincides with substantially the entirety of the front and back parts, and having enough elastic    elements/material    extending | Elastically stretchable regions covering almost all of both of the respective front and back parts, as illustrated below by Figure A, but not by Figure B.  Elastically stretchable regions in the below figures are highlighted in yellow and the front/back parts are outlines in red: |



15

transversely across the areas to render essentially the whole of the front and back parts elastically stretchable, but which do not require the elastic elements/material to cover all or almost all of the area.



Figure A: "Covering Almost All"

Figure B- Not "Covering Almost All"

The parties agree that the claim term "elastically stretchable regions covering essentially the whole of each of the respective front and back parts" should be construed consistent with "elastically stretchable region covering essentially the whole of at least one of the respective front and back parts."   For the reasons set forth above, the Court defines this claim term as: "an area bounded by elastic elements/material incorporating a continuous number of elastic elements/material that is capable of being stretched covering almost all or substantially all of the front and the back parts."

**D.  Construction of phrase "end parts of the absorbent layer . . . disposed within . . . elastically stretchable region(s)"**

The parties propose the following competing constructions of the term "end parts of the

absorbent layer . . . disposed within . . . elastically stretchable region(s)."

| SCA's Proposed Construction | First Quality's Proposed Construction |
|---|---|
| Ordinary and customary meaning as understood by a person of ordinary skill in the art at the time of the invention in the context of the claimed invention. | The ends of the absorbent pad are located inside an area or areas containing stretchable elastic elements or material and those elastically stretchable elements or material extend over the end(s) of the absorbent pad as illustrated in the figure below.  In the below figure, areas containing elastically stretchable elements are highlighted in yellow and are shown extending over the ends of the absorbent pad which pad is outlined in red:<br><br> |

First Quality suggests that the Court should interpret "end parts of the absorbent layer . . . disposed within . . . elastically stretchable region(s)" to mean the "elastically stretchable elements or material extend over the end(s) of the absorbent pad."  The Court disagrees.  The term "disposed within" does not lend itself to a construction of "extend over" when viewed in light of the other instances "disposed within" is used in the claims.  For example, claim 1 also requires "the central part of the absorbent layer being *disposed within* the relatively non-stretchable crotch part of the diaper." ('646 Patent, col. 9, 4-6 (emphasis added).)

17

Additionally, First Quality's reliance on the statements made by SCA during the prosecution history and reexamination history regarding how the elastically stretchable region "overlies" the absorbent pad, is "outside" the absorbent pad, and is facing away and remote from the inner casing layer  do not support First Quality's construction of the term "end parts of the absorbent layer . . . disposed within . . . elastically stretchable region(s)." (SCA-FQ00256630, SCA-FQ00256540, SCA-FQ00256557.)  Contrary to First Quality's argument, these statements are not disclaimers of the term "disposed within" but are instead an explanation or recitation of the language of claim 1. Claim 1 specifically requires "at least one of the stretchable regions being disposed on the side of the absorbent layer facing away from the inner casing layer, whereby those forces that are exerted by the elastically stretchable region on at least one of the end part of the absorbent layer function to hold the absorbent layer in sealing abutment with the wearer when the pants-type diaper is worn." ('646 Patent, Claim 1.)  These additional terms located in claim 1 account for the statements made in the prosecution and reexamination history.

Accordingly, given that the parties do not dispute the construction of the term absorbent pad and in light of the Court's construction of the phrase "elastically stretchable region," the Court accords the phrase "end parts of the absorbent layer . . . disposed within" its ordinary and customary meaning as understood in the context of the claimed invention by one skilled in the art at the time of the invention.

### E.  Construction of phrase "to hold the absorbent layer in sealing abutment with the wearer"

The parties propose the following competing constructions of the term "to hold the absorbent layer in sealing abutment with the wearer."

18

| SCA's Proposed Construction | First Quality's Proposed Construction |
|---|---|
| Ordinary and customary meaning as understood by a person of ordinary skill in the art at the time of the invention in the context of the claimed invention. | The pad of the pants-type diaper is held against the wearer in such a way that there is no leakage. |

A review of the claim and the specification suggest that the term "to hold the absorbent layer in sealing abutment with the wearer" should be accorded its ordinary and customary meaning.  One skilled in the art at the time of the invention reading the phrase in the context of the claimed invention would understand that the phrase describes the end part of the absorbent layer being held against the wearer's body.  This construction of the phrase is consistent with the statements made by SCA in the prosecution history.  For example, SCA stated that "[t]he principal idea is to achieve a strong elastic force pressing the absorbent layer against the abdomen and back of the wearer." (SCA-FQ00256557.)

First Quality's proposed construction requires the diaper to be held against the wearer in such a way to assure no leakage.  First Quality cites the reexamination history in support of its construction.  In its initial rejection of the claims, the Patent Examiner cited "Test Example 1 in col. 8 leak and slip test" as evidence to show that Watanabe taught sealing abutment.  In response to this evidence, SCA stated that:

> *Watanabe et al.* do not teach or suggest any relationship between the elastic regions of the front or back parts and the absorbent layer, more specifically, no relationship where the elastically stretchable region holds the absorbent layer in sealing abutment with the wearer.  The Office cites Test Example 1 in column 8 and slip tests from *Watanabe et al.*  However, the test states that "artificial urine was supplied until a leak occurred . . . ."  Column 8, line 49.  Such a test and disclosure do not teach or suggest that the forces that are exerted by the elastically stretchable region on a[t] least one of the end parts of the absorbent layer function to hold the absorbent layer in <u>sealing abutment</u> with the wearer when the pants-type diaper is worn.  Instead, the test and disclosure teach, if anything, that the absorbent layer is not held in sealing abutment because leakage occurs.
>
> Thus, the combination of *Watanabe et al.* and the cited art does not disclose,

teach or suggest the element of claim 15 of the present patent.

(SCA-FQ00256876-77.)  See also SCA-FQ00256904 ("A test that shows a leak cannot be the support relied up to teach the claimed invention.")  First Quality argues that SCA's statements regarding the leak test qualify as a prosecution disclaimer and, therefore, dictate the construction of the claim term "to hold the absorbent layer in sealing abutment with the wearer" to mean "no leakage."  In contrast, SCA suggests that the statements set forth above demonstrate that throughout the reexamination, SCA questioned the propriety of a leak test to show that Watanabe teaches sealing abutment.  In fact, SCA distinguished Watanabe noting that the leak test "relates to the (potential) sealing effects of the waist and leg openings," not "the forces exerted on <u>at least one of the end parts of the absorbent layer</u> that holds the <u>absorbent layer</u> in sealing abutment with the wearer."  (SCA-FQ00256905.)

As discussed above, "where a statement is subject to multiple reasonable interpretations, at least one of which would not amount to a surrender of claim scope, as a matter of law, prosecution history disclaimer is not applicable."  <u>USHIP Intellectual Properties</u>, 2011 WL 6937460 at *1. "[F]or prosecution disclaimer to attach, our precedent requires that the alleged disavowing actions or statements made during prosecution be both clear and unmistakable."  <u>Omega Engineering</u>, 334 F.3d at 1325-26.  When viewed in the context of the written exchanges between the Patent Examiner and SCA during reexamination, the statements in question do not reflect a clear and unmistakable disclaimer that the claimed invention does not leak.

Finally, First Quality argues that its proposed construction is further supported by statements recently made by SCA in a lawsuit relating to the foreign counterpart of the '646 Patent in a civil action in France.  In the pleadings, SCA described the pants-type diaper disclosed as "effectively waterproof."  The Court declines to consider the extrinsic evidence regarding statements made by

20

SCA before the French tribunal.  See also  Zodiac Pool Care, Inc. v. Hoffinger Indus., Inc., 206 F.3d 1408, 1414 (Fed. Cir. 2000) (cautioning federal trial judges to "turn[ ] to extrinsic evidence only when the intrinsic evidence is insufficient to establish the clear meaning of the asserted claim").  Additionally, even if the Court were to consider such evidence, SCA did not characterize the diaper as waterproof or never leaking.  Rather, SCA stated that the diaper is "effectively waterproof."  This extrinsic evidence does not support First Quality's construction of the claim term.

For these reasons, the Court accords the claim term "to hold the absorbent layer in sealing abutment with the wearer" its ordinary and customary meaning as understood in the context of the claimed invention by one skilled in the art at the time of the invention.

### F.  Construction of phrase "separate region"

The parties propose the following competing constructions of the term "separate region."

| SCA's Proposed Construction | First Quality's Proposed Construction |
|---|---|
| Ordinary and customary meaning as understood by a person of ordinary skill in the art at the time of the invention in the context of the claimed invention. | Discrete locations. |

At the Markman hearing, the parties agreed on the construction of the claim term "separate region" to be defined as: "different areas."

### G.  Construction of phrase "stretching and contraction power"

The parties propose the following competing constructions of the term "stretching and contraction power."

| SCA's Proposed Construction | First Quality's Proposed Construction |
|---|---|
| Ordinary and customary meaning as understood by a person of ordinary skill in the art at the time of the invention in the context of the claimed invention. | The ability [of the elastic part of the diaper] to be deformed when a force is applied as calculated using the modulus of elasticity formula. |

21

The language of the claim in question requires "at least one of the end edge of the front and the back parts has at the waist opening of the pants at least one elastically stretchable waist part whose *stretching and contraction power* is greater than the remainder of the stretchable region." ('646 Patent col. 10, 36-39 (emphasis added).)  The parties agree that the claim language "stretching and contraction power" refers to a relative comparison of the elasticity between two portions of the stretchable region.  First Quality argues that the phrase "stretching and contraction power" should be construed in accordance with the modulus of elasticity.  In support of this argument, First Quality maintains that the statements by SCA made during reexamination support such a construction.

The Court disagrees.  First Quality fails to point to any part of the prosecution history where SCA defined "stretching and contraction power" in terms of the modulus of elasticity. The prosecution history reflects that SCA discussed modulus of elasticity only in relation to language contained in dependent claims 13 and 27 which relate to the spacing of the elastic threads in the crotch region.  In fact, it appears that SCA only defined the modulus of elasticity for the examiner upon noting that the examiner was improperly applying the modulus to the claim limitation of dependent claims 13 and 27. (SCA-FQ00256907.)  Claims 13 and 27 are not asserted in this litigation.  As a result, the Court rejects First Quality's attempt to limit the claims to a specific mathematical formula.  Instead, the Court accords the phrase "stretching and contraction power" its ordinary and customary meaning as understood in the context of the claimed invention by one skilled in the art at the time of the invention.

### III.  CONCLUSION

For the reasons discussed herein, the Court has determined that the disputed claims are to

be construed pursuant to this Claims Construction Memorandum Opinion and Order.

**IT IS SO ORDERED.**

cc: counsel of record