UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
BOWLING GREEN DIVISION
CIVIL ACTION NO. 1:10-CV-00122-GNS-HBB


SCA HYGIENE PRODUCTS
AKTIEBOLAG, et al.                                                    PLAINTIFFS

v.

FIRST QUALITY
BABY PRODUCTS, LLC, et al.                                           DEFENDANTS


**MEMORANDUM OPINION & ORDER**

This is a patent infringement case involving disposable pants-type diapers. Plaintiffs

SCA Hygiene Products Aktiebolag and SCA Personal Care, Inc. (collectively, "SCA") allege

that certain products manufactured and sold by Defendants First Quality Baby Products, LLC,

First Quality Hygienic, Inc., First Quality Products, Inc., and First Quality Retail Services, LLC

(collectively, "First Quality") infringe the asserted claims of U.S. Patent No. 6,375,646 and its

accompanying Reexamination Certificate (collectively, the "'646 Patent"). This matter is before

the Court upon: (1) First Quality's Motion to Exclude Portions of the Expert Report of Earle

Sherrod Relating to Infringement and for Summary Judgment of Non-Infringement (DN 96); (2)

First Quality's Motion to Exclude Portions of Expert Reports of Earle Sherrod & Richard Gering

Relating to Commercial Success (DN 97); (3) SCA's Motion to Preclude Expert Testimony of

Daniel D. Gardner, Jr. on the Issue of Infringement of the Patent-in-Suit (DN 100); and (4) First

Quality's Motion for Partial Summary Judgment of Non-Infringement (DN 98).

## I.     BACKGROUND

The '646 Patent describes a pants-type diaper for use by both potty-training children and

adults with incontinence issues. (Claims Construction Mem. Op. & Order 4, DN 61). Before the

Court can address the motions at hand, a brief discussion of the diaper outlined in the specification of the '646 Patent is necessary. The easiest way to describe the diaper is to work from an illustration of the preferred embodiment, which is provided in the patent and reproduced below.



The diaper has a front part and a back part (1 and 2) with side edges (4 and 5) and one end edge on each side (6 and 7). U.S. Patent No. 6,375,646 col. 5 ll. 46-48, 55-57 (filed Apr. 23, 2002). The diaper's side edges are joined together to create the final product. *Id.* at col. 5 ll. 63-66. A crotch part (3) is located between the front and back parts, and the side edges of the crotch (8) form the leg openings when the product is assembled. *Id.* at col. 5 ll. 49-52, 57-62. The front and back parts of the diaper have elastically stretchable regions (29 and 30)—the elastically stretchable regions are comprised of elastic elements, such as elastic threads, film, laminate,

2

bands, or ribbons.  *Id.* at col. 7, ll. 17-28, 37-41.  The diaper also has elastically stretchable front and back waist parts (31 and 32).  *Id.* at col. 7, ll. 59-61.  Finally, the diaper includes an elongated absorbent pad (14).  *Id.* at col. 6, ll. 4-8.  The absorbent pad has a front end part (17) and a back end part (18).  *Id.* at 6, ll. 35-36.

The '646 Patent contains 38 claims.  Claims 1 and 15 are independent claims; the rest are dependent.  Independent claim 1 states, in relevant part:

> [T]he pants-type diaper further comprises at least one elastically stretchable region covering essentially the whole of at least one of the respective front and back parts; the crotch part being essentially non-stretchable in relation to said stretchable region; at least one of the respective end parts of the absorbent layer being disposed within one of said elastically stretchable regions; the central part of the absorbent layer being disposed within the relatively non-stretchable crotch part of the diaper; and at least one of the stretchable regions being disposed on the side of the absorbent layer facing away from the inner casing layer, whereby those forces that are exerted by the elastically stretchable region on at least one of the end part of the absorbent layer function to hold the absorbent layer in sealing abutment with the wearer when the pants-type diaper is worn.

*Id.* at col. 8, ll. 64-67, col. 9, ll. 1-13.  Similarly, independent claim 15 provides:

> [A]t least one of the respective front and back parts has at least one elastically stretchable region; the crotch part being essentially non-stretchable in relation to said stretchable region; at least one of the respective end parts of the absorbent layer being disposed within one of said elastically stretchable regions; the central part of the absorbent layer being disposed within the relatively non-stretchable crotch part of the diaper; and at least one of the stretchable regions being disposed on the side of the absorbent layer facing away from the inner casing layer, whereby those forces that are exerted by the elastically stretchable region on at least one of the end part of the absorbent layer function to hold the absorbent layer in sealing abutment with the wearer when the pants-type diaper is worn; and at least one of the end edge of the front and the back parts has at the waist opening of the pants at least one elastically stretchable waist part whose stretching and contraction power is greater than the remainder of the stretchable region.

*Id.* at col. 10, ll. 21-39.

SCA filed this action on August 2, 2010, alleging that a number of First Quality's products infringe the '646 Patent.  (Compl., DN 1).  For sake of convenience, the parties have

grouped the products accused of infringing into nine representative categories: (1) SCA-AP-020; (2) SCA-AP-050; (3) SCA-AP-056; (4) SCA-AP-016; (5) SCA-AP-051; (6) SCA-AP-001; (7) SCA-AP-004; (8) SCA-AP-010; and (9) SCA-00-AP-008/023[1] (collectively, "the Accused Products"). (*See* Email from Evans to Mandaro, DN 100-9; Email and Letter from Mandaro to Flannery, DN 100-10; Email from Mandaro to Evans, DN 100-11). SCA has asserted claims 1-6, 10-11, 15-21, and 35-38 against SCA-AP-020, 023, 050, and 056; claims 15, 18-21, and 25 against SCA-AP-001, 004, 016, and 051; and claims 1-11, 15-25, and 35-38 against SCA-AP-010. (Sherrod Decl. 18, DN 107-3).

On December 29, 2011, the Court conducted a claim construction hearing as required by *Markman v. Westview Instruments, Inc*., 517 U.S. 370 (1996). (Order, DN 60). Following the hearing and a review of the parties' submissions the Court entered a *Markman* Order, construing the disputed terms of the '646 Patent. (Claims Construction Mem. Op. & Order 22-23, DN 61). Subsequently, the Court granted summary judgment for First Quality on grounds of laches and equitable estoppel. (Mem. Op. & Order, DN 119). SCA appealed. (Notice of Appeal, DN 122). The Federal Circuit affirmed this Court's grant of summary judgment as to laches, reversed as to equitable estoppel, and remanded for further consistent proceedings. (Op. 21, DN 134). SCA petitioned the United States Supreme Court for writ of certiorari as to the Federal Circuit's decision on First Quality's laches defense, and the Supreme Court granted SCA's petition (DN 149). Recently, the Supreme Court vacated the Federal Circuit's ruling in part and remanded for further consistent proceedings. *SCA Hygiene Prods. Aktiebolag v. First Quality Baby Prods.*, 197 L. Ed. 2d 292, 305 (2017).

---

[1] The parties have, at times, used SCA-AP-008 and 023 interchangeably. At this point, however, it appears that the parties have settled on SCA-AP-023.

Before the Supreme Court made its ruling, SCA moved to stay proceedings in this Court. (*See* Mot. Stay Pending Petition for Writ of Cert. 1, DN 139-1). The Court denied SCA's request on grounds of judicial economy because there were a number of motions to be resolved wholly unrelated to the matter before the Supreme Court. (Order 1-2, DN 150). The Court will now address the merits of those motions.

## II.      JURISDICTION

The Court has subject-matter jurisdiction under 28 U.S.C. § 1331 because a federal question is presented.

## III.      DISCUSSION

### A.      Motions Concerning Expert Testimony

According to the Federal Circuit, regional circuit law applies to evidentiary rulings in patent cases. *Liquid Dynamics Corp. v. Vaughn Co.*, 449 F.3d 1209, 1218 (Fed. Cir. 2006) (citing *Advanced Cardiovascular Sys., Inc. v. Medtronic, Inc.*, 265 F.3d 1294, 1308 (Fed Cir. 2001)). Generally, Rules 702 and 104(a) of the Federal Rules of Evidence govern the admissibility of expert testimony. *See Nelson v. Tenn. Gas Pipeline Co.*, 243 F.3d 244, 250 (6th Cir. 2001) (citing *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 589 (1993)). Rule 702 provides:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
>
> > (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
> >
> > (b) the testimony is based on sufficient facts or data;
> >
> > (c) the testimony is the product of reliable principles and methods; and
> >
> > (d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702.

Under *Daubert v. Merrell Dow Pharmaceuticals*, Rules 702 and 104(a) require that the trial court act as a gatekeeper and ensure that expert testimony is both relevant and reliable. *Daubert*, 509 U.S. at 589; *Conwood Co. v. U.S. Tobacco Co.*, 290 F.3d 768, 792 (6th Cir. 2002). The test for relevancy is one of "fit," meaning the testimony must be sufficiently related to the facts of the case such that it will aid the trier of fact in understanding the evidence or determining a fact in issue. *Daubert*, 509 U.S. at 591.

When determining reliability, a key consideration for the trial court in carrying out its gatekeeping function is "whether the reasoning or methodology underlying the testimony is sufficiently valid . . . ." *Daubert*, 509 U.S. at 592-93. The Supreme Court, however, has advised that the inquiry is flexible and that "[t]he focus . . . must be solely on principles and methodology, not on the conclusions they generate." *Id.* at 594-95. There is no definitive checklist for determining whether an expert's testimony is reliable, but *Daubert* outlines factors for courts to consider, such as: (1) whether the theory or method in question "can be (and has been) tested"; (2) whether it "has been subjected to peer review and publication"; (3) whether it has a "known or potential rate of error"; and (4) whether the theory or technique enjoys "general acceptance" in the "relevant scientific community." *Id.* at 593-94.

*Daubert* applies to all expert testimony. *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 150 (1999). The factors, however, are not exhaustive. *See id.* Moreover, where a party challenges the testimony of a proffered expert for insufficient "factual basis, data, principles, methods, or their application . . . the trial judge must determine whether the testimony has a reliable basis in the knowledge and experience of [his or her] discipline." *Id.* at 149 (quoting *Daubert*, 509 U.S. at 592). *Daubert* involves balancing the desire to liberally admit relevant evidence against the necessity of excluding misrepresentative "junk science." *Best v. Lowe's*

*Home Ctrs., Inc.*, 563 F.3d 171, 176-77 (6th Cir. 2009) (citing *Amorgianos v. Nat'l R.R. Passenger Corp.*, 303 F.3d 256, 267 (2d Cir. 2002)).

While the trial court is not required to hold a *Daubert* hearing to determine the admissibility of expert testimony, it must ensure that the testimony is both relevant and reliable. *See Clay v. Ford Motor Co.*, 215 F.3d 663, 667 (6th Cir. 2000); *Nelson*, 243 F.3d at 248-49 (citing *Greenwell v. Boatwright*, 184 F.3d 492, 498 (6th Cir. 1999)). Ultimately, "a trial judge . . . ha[s] considerable leeway in deciding whether particular expert testimony is reliable," and the decision is reviewed for abuse of discretion. *Kumho Tire*, 526 U.S. at 142, 152; *Conwood*, 290 F.3d at 792; *see also Tamraz v. Lincoln Elec. Co.*, 620 F.3d 665, 672 (6th Cir. 2010) ("Rule 702, we recognize, does not require anything approaching absolutely certainty. And where one person sees speculation, we acknowledge, another may see knowledge, which is why the district court enjoys broad discretion over where to draw the line." (internal citation omitted) (citation omitted)).

> **1.** **First Quality's Motion to Exclude Portions of Sherrod's Report Relating to Infringement and for Summary Judgment of Non-Infringement**

To prevail in its infringement suit, SCA must prove that the Accused Products practice the following limitation: "those forces that are exerted by the elastically stretchable region on at least one end part of the absorbent layer function to hold the absorbent layer in sealing abutment with the wearer when the pants-type diaper is worn" (the "sealing abutment limitation"). *See* U.S. Patent No. 6,375,646 col. 9 ll. 8-12, col. 10, ll. 31-35. Additionally, to prevail as to independent claim 15, SCA must prove that the Accused Products have an "elastically stretchable waist part whose stretching and contraction power is greater than the remainder of the stretchable region" (the "stretching and contraction power limitation"). *See id.* at col. 10, ll. 35-

39. To meet its burden, SCA offers the opinion of Earle Sherrod ("Sherrod"). Sherrod has over ten years of experience in the area of incontinence-product development. (Sherrod Report 2-3, DN 107-3). He relied on his experience, the Court's claim construction opinion, review of technical documents, deposition testimony, and visual inspection and testing of the Accused Products in reaching his conclusions on these limitations. (Sherrod Report 20, 39-40, 43-45; Sherrod Report Ex. B, at 27-42, DN 96-8). First Quality contends that Sherrod's opinions contained in paragraphs 71-72; 102-103; 111-116; Exhibits M-V, BB, CC, and portions of Exhibits DD-EE of his report, all of which relate to the sealing abutment and stretching and contraction power limitations, are inadmissible. (Defs.' Mem. Supp. Mot. Exclude Portions of Expert Report of Earle Sherrod Relating to Infringement & for Summ. J. 1, DN 96-1 [hereinafter Defs.' Mot. Exclude—Infringement]). Likewise, because Sherrod's opinion is the only evidence offered by SCA as proof that the sealing abutment and stretching and contraction power limitations are found in the Accused Products, First Quality has moved for summary judgment of non-infringement. (Defs.' Mot. Exclude—Infringement 1-2).

Sherrod opines that each of the Accused Products meets the sealing abutment limitation. (Sherrod Report 41). First, Sherrod notes that one of ordinary skill in the art visually inspecting the Accused Products when worn by an appropriately-sized wearer would conclude that the sealing abutment limitation is met because, for example, when the products are placed on a mannequin one can see that the front end of the absorbent core is held against the body of the wearer. (Sherrod Report 40-41). Second, Sherrod opines that based on the design of the accused products, one of ordinary skill in the art examining the products would determine that all of the accused products are designed to fit against the body of the wearer and reduce leakage. (Sherrod Report 40). Third, through his review of deposition testimony, Sherrod maintains that First

Quality has confirmed that all of the Accused Products were designed to fit against the body of the wearer when worn. (Sherrod Report 40).

Finally, Sherrod declares that testing confirms the sealing abutment limitation is met. (Sherrod Report 40). Sherrod designed and laboratory technicians conducted a test that uses cylinders and a pressure sensor to determine the forces exerted by the elastically stretchable region. (Sherrod Report 29-30; Sherrod Report Ex. CC, DN 96-12; Sherrod Report Ex. CC, DN 96-13). Under Sherrod's test protocols, a pressure sensor was taped to the appropriate cylinder at least two centimeters below the rim. (Sherrod Report 30). Each product was marked at the following two locations: (1) under the center of belly elastics between the waist and the front edge of the core and (2) under an end part of the absorbent core. (Sherrod Report 30; Sherrod Report Ex. CC, DN 96-12; Sherrod Report Ex. CC, DN 96-13). The product was then placed over the cylinder such that the first marking position on the product (under the center of belly elastics) was aligned with the sensor. (Sherrod Report 30; Sherrod Report Ex. CC, DN 96-12; Sherrod Report Ex. CC, DN 96-13). The product remained in this position for approximately 90 seconds while an image of the forces acting on the pressure sensor was recorded and saved. (Sherrod Report 30; Sherrod Report Ex. CC, DN 96-12; Sherrod Report Ex. CC, DN 96-13). The product was then repositioned on the cylinder such that the second marking position on the product (under an end part of the absorbent core) was aligned with the sensor. (Sherrod Report 30; Sherrod Report Ex. CC, DN 96-12; Sherrod Report Ex. CC, DN 96-13). Again, the product remained in this position for approximately 90 seconds while an image of the pressure forces acting on the pressure sensor was recorded and saved. (Sherrod Report 30; Sherrod Report Ex. CC, DN 96-12; Sherrod Report Ex. CC, DN 96-13). This process was repeated for nine

additional samples of the Accused Products in each representative category. (Sherrod Report 30; Sherrod Report Ex. CC, DN 96-12; Sherrod Report Ex. CC, DN 96-13).

After the tests were completed, Sherrod examined the recorded images. (Sherrod Report 40). According to Sherrod, the amount of pressure at a given point is directly related to the amount of force exerted by the elastically stretchable region on that point. (Sherrod Report 41). Each captured image displays the pressure resulting from the forces exerted by the elastically stretchable region on the wearer's body at the location of the pressure sensor. (Sherrod Report 40). If forces are exerted, the image shows color. (Sherrod Report 41; *see also, e.g.*, Sherrod Report Ex. M, at 64-73, DN 100-4). Because each image showed color, Sherrod concludes that on all of the Accused Products the elastically stretchable region exerts forces on the absorbent layer that holds it against the body of the wearer. (Sherrod Report 41).

Sherrod also opines that each Accused Product practices the stretching and contraction power limitation. (Sherrod Report 45). First, Sherrod notes that visual inspection of the products reveals that each product meets the stretching and contraction limitation because: (1) the material in each product is bunched more in the horizontal direction at the waist part of the product than it is in the remainder of the elastically stretchable region in the front or back part of the product as exhibited by the "necking" down of the product at the waist part; and (2) the elastic elements or material at the waist part are more closely spaced and, in most cases, thicker than the elastic elements or material in the remainder of the elastically stretchable region on the front or back parts. (Sherrod Report 43-44).

Second, Sherrod states that the technical documents associated with the Accused Products indicate that the elastic elements or material in the waist part of the product, in general, have a greater pre-elongation and are of a higher denier than the elastic elements or material in

10

the remainder of the elastically stretchable region on the front or back part. (Sherrod Report 44). Moreover, through his review of deposition testimony, Sherrod believes that First Quality has admitted that many of the Accused Products meet the stretching and contraction limitation. (Sherrod Report 44).

Last, Sherrod maintains that tests confirm his visual inspection and analysis of technical documents. (Sherrod Report 44). Under Sherrod's test protocol, 25 millimeter strips were cut from the front and back of the product at three locations: (1) waist; (2) belly elastics in the elastically stretchable region; and (3) thigh elastics in the elastically stretchable region. (Sherrod Report 29; Sherrod Report Ex. BB, DN 96-12; Defs.' Mot. Exclude—Infringement 9). The strips were cut so that the side seam of the product remained intact, forming a circular sample. (Sherrod Report 29). The strips were then placed on an Instron 5965 testing instrument and stretched to two inches below the maximum fit range of the product. (Sherrod Report 29; Sherrod Report Ex. BB, DN 96-24). This process was repeated for nine additional samples of the Accused Products in each representative category. (Sherrod Report 29; Sherrod Report Ex. BB, DN 96-24).

While Sherrod did not personally conduct the tests, he observed technicians perform testing on at least one product from each representative category to ensure that they were comfortable with the protocol. (Sherrod Report 29). After Sherrod determined that the technicians were performing capably, they completed the tests and gave Sherrod the raw data. (Sherrod Report 29). Sherrod then analyzed the data and concluded that the stretching and contraction limitation was met for all of the tested Accused Products. (Sherrod Report 29). Sherrod's Report contains graphs that illustrate the stretching power of each tested strip. (*See, e.g.*, Sherrod Report Ex. M, at 57-63, DN 100-4).

First Quality argues that Sherrod's opinions on sealing abutment and stretching and contraction power are inadmissible under *Daubert* and Rule 702 because his tests are unreliable and, aside from the tests, his opinions rest on nothing more than generalized conclusions. With regard to the sealing abutment limitation, First Quality contends his pressure-sensing test is unreliable because: (1) it merely determines that *some force* is exerted by the diaper, which is not sufficient to show sealing abutment; (2) Sherrod did not explain his basis for the test; and (3) Sherrod did not use control samples.

Contrary to First Quality's assertion, however, Sherrod's pressure-sensing test is an appropriate way to show that the Accused Products meet the sealing abutment limitation. Importantly, "[o]nce a district court has construed the relevant claim terms, and unless altered by the district court, then that legal determination governs for purposes of trial. No party may contradict the court's construction to a jury." *Exergen Corp. v. Wal-Mart Stores, Inc.*, 575 F.3d 1312, 1321 (Fed. Cir. 2009). An expert's testimony must be consistent with the court's claim construction opinion. *See, e.g.*, *Medisim Ltd. v. BestMed LLC*, 861 F. Supp. 2d 158, 171 (S.D.N.Y. 2012).

The pressure-sensing test is consistent with this Court's claim construction opinion. In the *Markman* opinion, the Court accorded the phrase "to hold the absorbent layer in sealing abutment with the wearer" its ordinary and customary meaning as understood in the context of the claimed invention by one skilled in the art at the time of the invention. (Claim Construction Mem. Op. & Order 21). Moreover, the Court specifically noted that "[o]ne skilled in the art at the time of the invention reading the phrase [sealing abutment] in the context of the claimed invention would understand that the phrase describes the end part of the absorbent layer being held against the wearer." (Claims Construction Mem. Op. & Order 19). It follows that,

depending on the construction of a pants-type diaper, the end part of the absorbent layer could be spaced away from the body, could lie closely without contact, or could be pressed into contact with the body of the wearer. In the context of the '646 Patent, however, the elastic elements or material in the elastically stretchable region exert forces strong enough to actually press the end part of the pad against the body. In turn, Sherrod's test is appropriate to determine sealing abutment. The end part of the absorbent pad will not press against the wearer if the elastically stretchable region does not exert force of sufficient strength upon it. Likewise, if the pressure sensor records forces acting on it, the sealing abutment limitation is met; if it does not, the limitation is not met.

First Quality urges that leakage is the true measure of sealing abutment and that Sherrod's failure to test for leakage renders his opinion unreliable. First Quality's argument is unpersuasive because it ignores the claim construction opinion. During claim construction, First Quality's proposed construction of the term "sealing abutment" was that "[t]he pad of the pants-type diaper is held against the wearer in such a way that there is no leakage[,]" and the Court rejected this construction. (Defs.' Opening Claim Construction Br. 31-32, DN 52; Claims Construction Mem. Op. & Order 19-21). Furthermore, while it is true that a pad held in sealing abutment with the wearer's body will reduce leakage, it does not necessarily follow that a test for leakage measures sealing abutment. In his declaration, Sherrod notes that a leak test shows how much fluid a product can hold before it leaks, which is a function of many factors, including for example, the absorbency of the product and the effectiveness of the "gasketing" at the legs and waist. (Sherrod Decl. 28). Moreover, SCA explained to the PTO during reexamination of the '646 Patent and to this Court at the *Markman* hearing that a leak test does not measure sealing abutment because it "relates to the (potential) sealing effects of the waist and leg openings," not

"the forces exerted on at least one of the end parts of the absorbent layer that holds the absorbent layer in sealing abutment with the wearer."  (Claims Construction Mem. Op. & Order 20).  As a result, the Court cannot say that Sherrod's testing is unreliable merely because it does not address leakage.

Relying on the fact that a prior absorbent pants-type diaper patent was tested using mannequins, First Quality claims that the pressure-sensing test is inappropriate because it uses cylinders.  Sherrod did not arbitrarily decide to use cylinders.  Rather, he explained that he used cylinders to foster consistency and accommodate the range of size of people that would wear the elastics at issue.  (Sherrod Dep. 553:2-554:18, Dec. 11, 2012, DN 96-16).  Sherrod's pressure-sensing test is not unreliable simply because he used cylinders rather than mannequins; he was not required to use mannequins for his test just because other diapers have been tested that way. *See Best*, 563 F.3d at 181 ("Admissibility under Rule 702 does not require perfect methodology.").  In this respect, weaknesses in Sherrod's methodology may affect the weight his opinion is given at trial, but not its threshold admissibility.  *Id.* at 182 (citing *Kudabeck v. Kroger Co.*, 338 F.3d 856, 861-62 (8th Cir. 2003)).

First Quality's reliance on *Warner Chilcott Laboratories Ireland Ltd. v. Impax Laboratories, Inc.*, Nos. 2:08-cv-06304, 2:09-cv-02073, 2:09-cv-01233, 2012 U.S. Dist. LEXIS 60386 (D.N.J. Apr. 30, 2012), for the proposition that Sherrod's testing is unreliable is misplaced.  In *Warner Chilcott*, an unpublished case from a sister court, the expert failed to provide the parameters used for his testing or explain the reason for the methodology he had chosen.  *Id.* at *73-74.  Parts of the expert's tests were simply arbitrary.  *See id.*  In the present case, however, Sherrod explained why the pressure-sensing test measures sealing abutment in his opening report and his deposition.  (Sherrod Report 39-41; Sherrod Dep. 552:18-554:18, 559:21-

560:23). Further, in light of the Court's claim construction the pressure-sensing test is a non-arbitrary, reliable measurement of the sealing abutment limitation. *See In re Scrap Metal Antitrust Litig.*, 527 F.3d 517, 529 (6th Cir. 2008) ("[T]he requirement that an expert's testimony be reliable means that it must be 'supported by appropriate validation—i.e., "good grounds," based on what is known.'" (quoting *Daubert*, 509 U.S. at 590)).

Finally, First Quality's argument that the pressure-sensing test is unreliable because it lacks control samples is unpersuasive. First Quality cites *Dal-Tile Corp. v. United States*, 424 F.3d 1286, 1292 (Fed. Cir. 2005), for the proposition that "basic principles or methods of scientific inquiry [require] using a representative sample population, using control groups, or testing hypotheses via., e.g., statistical checks." (Defs.' Reply Mot. Exclude Portions Expert Reports of Earle Sherrod Relating to Infringement & for Summ. J. 9, DN 115). In that decision, however, the Federal Circuit was quoting the Court of International Trade and did not specifically hold that *Daubert* requires the use of control samples in all cases. *Dal-Tile Corp.*, 424 F.3d at 1292. The Court accepts the notion that controls can be an element of *Daubert*'s concern with reliability. *See United States v. Hebshie*, 754 F. Supp. 2d 89, 123 (D. Mass. 2010). Nevertheless, the Court's inquiry under *Daubert* is a "flexible one" geared to the facts of each case. *See id.* ("The government cannot just say that in some situations, or in general, a single sample will suffice. They have to show that *in this case, on these facts*, a single sample was reliable."); *Daubert*, 509 U.S. at 594-95.

In *Hebshie*, upon which First Quality relies heavily, the government's expert tested a sample of carpet to determine if it contained chemicals connecting the defendant to a fire. *Hebshie*, 754 F. Supp. 2d at 99, 103. The government used only one carpet sample in its testing, which it gathered from the place investigators had already determined to be the fire's point of

origin. *Id.* at 123. The court found that such a practice ignores that the chemical found in the carpet could have been the result of the defendant's actions or something else, which is why a "control" was so important to avoid the risk of a "false positive"—the expert should have tested another sample of carpet collected away from the alleged point of origin. *Id.*

In the present case, ten samples from each of the nine representative product groups were tested. (Sherrod Report 30). Before each sample was subjected to the pressure-sensing test, the technicians performing the test checked the sensor to confirm that it was properly balanced and not recording any forces when no product was on the cylinder. (Sherrod Decl. 27). These procedures alone are sufficient to distinguish Sherrod's testing from the practice rejected in *Hebshie*.

First Quality's position that, aside from testing, Sherrod's opinion on sealing abutment rests on nothing more than generalized conclusions is unfounded. Sherrod bases his opinion on visual observation, inspection of the Accused Products, and a review of deposition testimony. For example, Sherrod explained in his opening report that "when products are placed on a mannequin, it can be seen that the front end part of the absorbent core is held against the body of the wearer." (Sherrod Report 40). Given the Court's prior construction of sealing abutment, such an observation provides a reliable foundation for Sherrod's opinion. *See Exergen Corp.*, 575 F.3d at 1321; *In re Scrap Metal*, 527 F.3d at 529-30 ("[T]he task for the district court in deciding whether an expert's opinion is reliable is not to determine whether it is correct, but rather to determine whether is rests upon a reliable foundation, as opposed to, say, unsupported speculation." (citing Fed. R. Evid. 702)). The Court's role here is not to determine the correctness of Sherrod's opinion. *See Powell v. Tosh*, 942 F. Supp. 2d 678, 720 (W.D. Ky. 2013)

(citing *In re Scrap Metal*, 527 F.3d at 529-30). Sherrod's opinion on sealing abutment is reliable because it rests on reasonable grounds; therefore, it is admissible.

The Court must next determine whether Sherrod's opinion that the stretching and contraction power limitation is found in all of the Accused Products rests upon a reliable foundation. Sherrod's test used an Instron device to determine the stretchability of the materials at issue, which testing is common in the industry. (Sherrod Report Ex. BB, at 49-50, DN 96-12; Sherrod Decl. 21; Silwanowicz Dep. 146:20-149:10, May 3, 2012, DN 107-27). Indeed, First Quality tests its own products using an Instron. (Sherrod Decl. 21; Silwanowicz Dep. 146:20-149:10). Sherrod developed detailed test protocols with the Court's claim construction opinion and the technical specifications of First Quality's products in mind. The technicians performing the tests recorded the results, and Sherrod analyzed those results and reproduced the data in his report.

First Quality contends that Sherrod's stretching-and-contraction-power test is unreliable because: (1) it ignores the definition of the terms "waist part" and "remainder of the elastically stretchable region" found in the '646 Patent and skews the test results towards infringement—the 25 millimeter "waist" strips include extra elastic from the remainder of the elastically stretchable region (increasing stretching power), while the other 25 millimeter strips are smaller than the actual "remainder" and have less elastic than they should (decreasing stretching power); (2) it fails to provide results for contraction power; and (3) it was not performed correctly—the test lacked adequate quality control measures, the strips cut for testing were not uniformly 25 millimeters wide (the width of the waist strip and belly-elastic strip in actual samples tested ranged from 20 millimeters to 30 millimeters), and one belly-elastic strip had cut elastics and split side seams, presumably resulting in reduced stretching power.

The Court is not convinced that the size of the strips that Sherrod tested is fatal to the admissibility of his testimony. In *Quiet Tech. DC-8, Inc. v. Hurel-Dubois UK Ltd.*, 326 F.3d 1333 (11th Cir. 2002), the appellant argued that the expert used incorrect data or was missing data to run the study at hand and used the wrong equations to run the analysis. *Id.* at 1344. According to appellant, if the data was incorrect, the expert's conclusions were necessarily flawed and had to be excluded. *Id.* at 1344-45. The court disagreed and found that the appellant's argument went to the weight of the evidence, rather than admissibility. *Id.* at 1345. Moreover, in *Jahn v. Equine Services*, 233 F.3d 382 (6th Cir. 2000), the Sixth Circuit reversed a trial judge's decision to exclude proposed expert testimony. The court explained that although the opinions of the proffered testimony "may very well be 'shaky,'" because the opinions were based upon facts in the record, and were not "assumptions" or "guesses," challenges merely went to the accuracy of the conclusions, not to the reliability of the testimony. *Id.* at 390-93. Ultimately, while it is true that a significant error in the application of an expert's method will sometimes affect the admissibility of the expert's testimony, "rejection of expert testimony is the exception, rather than the rule." *Id.* (quoting Fed. R. Evid. 702 advisory committee's note, 2000 amend.).

In his declaration, Sherrod explains that the stretching and contraction testing protocol is based on the claim limitations found in the '646 Patent and the product specifications for the Accused Products. (Sherrod Decl. 24). After examining the specifications, Sherrod concludes that the target width of the waist part is, on average, up to approximately 25 millimeters. (Sherrod Decl. 24). He designed the test to compare the stretching and contraction power of a 25 millimeter waist strip against that of 25 millimeter strips from the remainder of the elastically stretchable region, one from the thigh region and one from the area between the waist and the

absorbent pad, "to achieve a statistically correct representation of the 'remainder.'" (Sherrod Decl. 24). Sherrod explains that comparing the stretching and contraction power of the waist part to the stretching and contraction power of the remainder of the elastically stretchable region is an "apples-to-apples" comparison of regions of the same size. (Sherrod Decl. 24).[2] Based on the product specifications for the Accused Products, Sherrod explains that "waist strands" are generally of a high denier or pre-elongation or are spaced closer together than the belly elastics in the same product, so the inclusion of belly elastic in the waist strip would actually *decrease* the stretching and contraction power of the strip. (Sherrod Decl. 25; Sherrod Dep. 181:3-18). Furthermore, based on the product specifications, Sherrod notes that the number of elastic strands in any given part of the products varies, as evidenced by the fact that the specifications set a target number of strands and provide a minimum and maximum acceptable number for quality control purposes. (Sherrod Decl. 25).

Sherrod's failure to record results for contraction power does not render his testing unreliable. The stretching and contraction power limitation is concerned with the relative comparison of the stretching and contraction power of the waist to the remainder, and there is support for the proposition that the contraction curves would show the same relative difference between the sections as demonstrated by the stretching curves. Sherrod explains in his declaration that the contraction results were duplicative of the information provided by the stretching power results provided in his report. (Sherrod Decl. 23). In fact, First Quality's own expert is essentially in agreement with Sherrod on this point. (Gardner Dep. 90:13-94:2, Dec. 18, 2012, DN 107-21). If First Quality believes it can show that contraction power does not

---

[2] When pressed about this in deposition, Sherrod stated, "I am not sure what you are getting at. But the stretching and contraction power of the elastic stretchable region is going to be fairly consistent all the way through. By adding and subtracting strands from the sample, you're not – you're not changing anything." (Sherrod Dep. 189:2).

mirror stretching power, it certainly will be able raise the issue on cross examination. *See Best*, 563 F.3d at 180 (citing *Daubert*, 509 U.S. at 596)).

First Quality is incorrect in asserting that Sherrod's declaration cannot be considered. Generally, Rule 26 of the Federal Rules of Civil Procedure does not prohibit an expert from revising and clarifying his opinions, so long as the testimony is not a departure from the "general scheme" of the expert's report. *McHugh v. Olympia Entm't, Inc.*, 37 F. App'x 730, 735-36 (6th Cir. 2002); *Hochstein v. Microsoft Corp.*, No. 04-73071, 2006 U.S. Dist. LEXIS 74574, at *15-16 (E.D. Mich. Oct. 13, 2006). Sherrod's declaration simply clarifies his opinion and is not a departure from the general scheme of his report. Therefore, the Court cannot say that Rule 26 prohibits its use.

First Quality's argument that the stretching and contraction power test is unreliable because it was performed incorrectly—it lacked adequate quality control measures, some samples might not have been exactly 25 millimeters, and one sample had split side seams—is similarly unpersuasive. First, Sherrod's test protocols describe in detail how to perform the test and how to address quality control. (Sherrod Report Ex. BB, at 49-50, DN 96-12). Under Sherrod's protocols, almost 200 samples were tested and maintained in individually labeled bags. (Pls. Opp'n Defs.' Mot. Exclude Portions Expert Report of Earle Sherrod Relating to Infringement & Summ. J. 22, DN 107 [hereinafter Pls.' Opp'n]; Sherrod Report Ex. BB, at 49-50, DN 96-12). If side seams or elastics were cut, technicians were instructed to place the product into a separate bag. (Sherrod Report Ex. BB, at 50, DN 96-12). Second, Sherrod explained in his deposition that it is difficult, if not impossible, to cut strips of exactly equal length. (Sherrod Dep. 172:18-24, 263:5-19). Moreover, the pictures that First Quality produced in support of its argument are of samples taken after testing. (*See* Defs.' Mot. Exclude—

Infringement 12).  In his declaration, Sherrod explained that "the ragged edges of the tested samples are the result of the impact of the elastic contraction of the sample on the woven-like nature of the spunbond material sheet of the tested sample, not any improper cutting."  (Sherrod Decl. 22, 23).  Third, the sample with cut elastics and split side seams that First Quality points to in support of its argument was not even tested, as SCA's counsel noted on the record during Sherrod's deposition.  (Sherrod Dep. 389:4-24).

First Quality is once again incorrect that, aside from testing, Sherrod's opinion rests on nothing more than generalized conclusions.  Sherrod's visual inspection of the Accused Products and review of technical documents, as outlined above, further bolster the reliability of his opinion.  It would no doubt be impermissible for Sherrod to blankly state that each Accused Product meets the stretching and contraction power limitation.  That is not the case here; Sherrod examined the Accused Products and the technical documents associated with them and explained why each meets the stretching and contraction power limitation.

Overall, after reviewing Sherrod's deposition, report, and declaration and the parties' submissions, the Court cannot say that Sherrod's opinion on the stretching and contraction power limitation rests on "assumptions or guesses."  *See Jahn*, 233 F.3d at 393; *see also United States v. L.E. Cooke Co.*, 991 F.2d 336, 342 (6th Cir. 1993).  It is simply not the purely speculative junk science that *Daubert* seeks to eliminate.  *See Johnson v. Stella Jones Corp.*, No. 5:13-CV-00101-TBR, 2015 U.S. Dist. LEXIS 19185, at *12 (W.D. Ky. Feb. 13, 2015).  In any event, the crux of First Quality's argument is that Sherrod's testing produced incorrect results, so that his proposed testimony is unreliable.  (*See* Defs.' Mot. Exclude—Infringement 8 ("In short, the use of 25 millimeter test strips . . . produces an incorrect result, a result that is biased in SCA's favor.")).  Again, it is not up to the Court to determine the correctness of Sherrod's opinion.  *See In re*

*Scrap Metal*, 527 F.3d at 529-30.  The appropriate way for First Quality to deal with Sherrod is through cross-examination and presentation of contrary evidence.  *See Best*, 563 F.3d at 180 (citing *Daubert*, 509 U.S. at 596).

First Quality also attacks Sherrod's opinions on sealing abutment and stretching and contraction power collectively.  It takes shots at both of Sherrod's tests by noting that they have not been peer reviewed and lack error rates.  Both are *Daubert* **factors**; they are not requirements.  *Daubert*, 509 U.S. at 593-94; *Kumho Tire*, 526 U.S. at 150.  The Supreme Court has recognized that the *Daubert* factors do not apply in every case.  *Kumho Tire*, 526 U.S. at 141-42 ("*Daubert's* list of specific factors neither necessarily nor exclusively applies to all experts or in every case.  Rather, the law grants a district court the same broad latitude when it decides how to determine reliability as it enjoys in respect to its ultimate determination." (citation omitted)).  Therefore, the lack of peer review or error rates is not fatal.

First Quality also argues that Sherrod's opinions are unreliable because the testing was performed by unsupervised technicians employed by SCA.  True, Sherrod did not perform and was not present for all testing, but he gave the technicians detailed protocols and ensured their capability in testing before leaving them unsupervised.  (Sherrod Decl. 22; Sherrod Report Ex. BB, at 49-50).  The technicians had over two years of testing experience and had used the equipment involved regularly for quality testing and prototype evaluation.  (Sherrod Decl. 22).  They kept a notebook that recorded testing conditions and products tested for a given day, which was given to First Quality's counsel.  (Sherrod Decl. 22; Pls.' Opp'n 21).  The technicians also videotaped the testing of one sample of each tested product, which Sherrod reviewed to confirm that the testing was conducted according to his protocols.  (Sherrod Decl. 22).

First Quality cites no authority for the proposition that Sherrod should have been present for all testing or that the tests he designed are automatically unreliable because persons employed by SCA performed them. Other courts have held that experts need not be present for testing. *See, e.g.*, *Astra Aktiebolag v. Andrx Pharm., Inc.*, 222 F. Supp. 2d 423, 492 (S.D.N.Y. 2002) (citing *Ecolab Inc. v. Amerikem Lab., Inc.*, 98 F. Supp. 2d 569, 574 (D.N.J. 2000)), *aff'd sub nom. In re Omeprazole Patent Litig.*, 84 F. App'x 76 (Fed. Cir. 2003). Moreover, Federal Rule of Evidence 703 provides that an expert "may base an opinion on facts or data in the case that the expert has been made aware of or personally observed." Fed. R. Evid. 703. First Quality's suggestion that SCA's employees falsified the test results lacks any support. Indeed, the test results reproduced in Sherrod's report suggest that there was no foul play—the results for the stretching and contraction power tests, for example, were consistent in each representative product category. (*See, e.g.*, Sherrod Report Ex. M, at 57-63, DN 100-4; Sherrod Report Ex. N, at 75-80, DN 100-4).

For all of these reasons, the Court concludes that Sherrod's opinions on sealing abutment and stretching and contracting power are admissible. Accordingly, this motion is denied.[3]

---

[3] Whether an accused product meets each limitation of an asserted claim is a question of fact. *See Int'l Rectifier Corp. v. IXYS Corp.*, 361 F.3d 1363, 1369 (Fed. Cir. 2004); *Bayer AG v. Elan Pharm. Research Corp.*, 212 F.3d 1241, 1247 (Fed. Cir. 2000). Summary judgment is appropriate only when there is no genuine dispute as to any material fact. Fed. R. Civ. P. 56(a). As noted above, both independent claims require SCA to prove that the sealing abutment limitation is found in the Accused Products, while claim 15 requires SCA to prove that the stretching and contraction power limitation is found in the Accused Products. Because the Court concludes that Sherrod's opinions on these limitations are admissible, there is a genuine dispute of material fact on these points. Therefore, summary judgment of non-infringement is inappropriate on this ground.

2.    *First Quality's Motion to Exclude Portions of Expert Reports of Earle Sherrod & Richard Gering Relating to Commercial Success*

First Quality argues that it cannot be liable for infringement because the '646 Patent is invalid for "obviousness" under 35 U.S.C. § 103.  To determine whether a patent is invalid for obviousness, one must examine whether "the differences between the claimed invention and the prior art are such that the claimed invention as a whole would have been obvious . . . to a person having ordinary skill in the art . . . ."  35 U.S.C. § 103.  As the Supreme Court and Federal Circuit have recognized, "[o]bviousness is a question of law based on underlying factual findings:  (1) the scope and content of the prior art; (2) the differences between the claims and the prior art; (3) the level of ordinary skill in the art; and (4) objective considerations of nonobviousness."  *In re Cyclobenzaprine Hydrochloride Extended-Release Capsule Patent Litig.*, 676 F.3d 1063, 1068 (Fed. Cir. 2012) (citing *Graham v. John Deere Co.*, 383 U.S. 1, 17-18 (1966)).

Objective considerations of nonobviousness include, among other things, the "commercial success of the patented invention."  *Id.* at 1075.  When a patentee asserts that commercial success supports its contention of nonobviousness, the patentee bears the burden of establishing a "nexus" or "sufficient relationship between the commercial success and the patented invention."  *Demaco Corp. v. F. Von Langsdorff Licensing Ltd.*, 851 F.2d 1387, 1392 (Fed. Cir. 1988) (citation omitted).  "For objective evidence [of non-obviousness] to be accorded substantial weight, its proponent must establish a nexus between the evidence and the merits of the claimed invention."  *In re GPAC Inc.*, 57 F.3d 1573, 1580 (Fed. Cir. 1995) (citation omitted).  "In meeting its burden of proof, the patentee in the first instance bears the burden of coming forward with evidence sufficient to constitute a prima facie case of the requisite nexus."  *Demaco*, 851 F.3d at 1392 (citation omitted).  To establish a prima facie case, the patentee must

produce "enough evidence to permit the trier of fact to infer the fact at issue." *Id.* (citation omitted). If the patentee does so, "the burden of coming forward with evidence in rebuttal shifts to the challenger, as in any civil litigation." *Id.* at 1393 (citation omitted).

To rebut First Quality's argument that the '646 Patent is invalid for obviousness, SCA planned to offer the testimony of Sherrod and Richard Gering ("Gering") to help show that the patented invention is a commercial success. First Quality seeks exclusion of their testimony under *Daubert* and Federal Rule of Evidence 702. (Defs.' Mem. Supp. Mot. Exclude Portions Expert Reports of Earle Sherrod & Richard Gering Relating to Commercial Success 1-2, DN 97-1 [hereinafter Defs.' Mot.—Commercial Success]). However, SCA has informed the Court that, after completion of the prior expert discovery period, it learned that Gering misrepresented having a Ph.D. in economics; therefore, it plans to retain another expert. (Pls.' Letter Ct. 2 n.1, DN 154-1). As a result, to the extent First Quality's motion seeks exclusion of Gering's opinion, it will be denied as moot.

The Court now turns to the admissibility of Sherrod's testimony concerning commercial success. In his report on validity, Sherrod explains that SCA's TENA® protective underwear practice the unique features claimed by the '646 Patent and that "virtually all" of First Quality's protective underwear and training pants include one or more of the unique features claimed by the '646 Patent. (Sherrod Validity Report, 63-64, DN 106-2). Sherrod states that a chassis design that embodies the invention of the '646 Patent has been "universally adopted and used in the adult protective underwear industry[,]" that "an arrangement of elastic elements or material that is similar to the arrangement described in the '646 Patent and implemented in SCA's products and the [Accused Products] has been implemented by all of the manufacturers of adult protective underwear in the United States of which [he is] aware[,]" and that he is "aware of only

one additional chassis design that has any traction in the United States market." (Sherrod Validity Report 64-65). Based on this, he also opines that products sold by Kimberly-Clark demonstrate commercial success. (Sherrod Validity Report 64-65). In further support, Sherrod notes that First Quality is primarily a private-label manufacturer that seeks "to make a product similar to the leading branded company, which is Kimberly-Clark in the United States protective underwear and training pant markets." (Sherrod Validity Report 65). Sherrod explains that he is "aware of information which suggests that First Quality compares its products to those of Kimberly-Clark, and because "the [Accused Products] incorporate the patented technology, it is reasonable to conclude that even First Quality would have to agree that Kimberly-Clark's protective underwear incorporate the patented technology." (Sherrod Validity Report 65).

First Quality argues that because SCA has not proven that its own products, or the products of Kimberly-Clark and other competitors, practice the claimed invention, SCA should be precluded from relying upon sales of those products to evidence commercial success. For the most part, First Quality's motion reads more like a motion for summary judgment on commercial success than a motion to preclude expert testimony under *Daubert* or Rule 702. First Quality notes that SCA must demonstrate a nexus between the commercial success and the patented invention, but explains that because SCA has not shown that any of its products or Kimberly-Clark's products practice the claimed invention, "we need not reach the nexus issue here." (Defs.' Mot.—Commercial Success 5-7). In essence, however, First Quality *is* arguing that Sherrod's testimony is inadmissible because it does not establish a sufficient nexus between commercial success and the patented invention. Sherrod's testimony, however, "need not establish commercial success . . . to be admissible; it only need be relevant and reliable." *Samsung Elecs. Co. v. Quanta Comput., Inc.*, No. C-00-4524 VRW, 2006 U.S. Dist. LEXIS

66447, at *38-39 (N.D. Cal. Sept. 15, 2006) (internal quotation marks omitted) (citing Fed. R. Evid. 702).

More specifically, First Quality contends that Sherrod's testimony concerning SCA's TENA® products is inadmissible because Sherrod never tested the TENA® products for infringement of the asserted claims—particularly, that Sherrod never tested whether the TENA® products practice the sealing abutment and stretching and contraction power limitations. The Court disagrees. Sherrod opines that SCA's protective underwear products embody the invention claimed in the '646 Patent. (Sherrod Validity Report 63). His opinion is based on a detailed, element-by-element analysis of SCA's patent claims and on physical inspection of SCA's products. (Sherrod Validity Report Ex. A, DN 106-2). Moreover, Sherrod explains that SCA's TENA® products differ only slightly from the Accused Products, which he did test for sealing abutment and stretching and contraction power. Therefore, the Court concludes that Sherrod's testimony on this point is admissible.

Similarly, First Quality argues for the exclusion of Sherrod's testimony concerning the commercial success of third-party products, including those sold by Kimberly-Clark. It maintains that it is not enough for SCA to assert that the success of Kimberly-Clark products is attributable to the chassis design claimed in the '646 Patent; "rather, as described above, [SCA] must show that the Kimberly-Clark products practice *every* limitation in the asserted claims, which claims are directed to an 'absorbent pants-type diaper," not just a "chassis design." (Defs.' Reply Supp. Mot. Exclude Portions Expert Reports of Earle Sherrod & Richard Gering Relating to Commercial Success 7, DN 113). Regardless of whether this is the evidentiary burden SCA must ultimately surmount in order to prove commercial success, SCA's argument

has little to do with whether Sherrod's testimony is admissible in the first place. *See Samsung Elecs.*, 2006 U.S. Dist. LEXIS 66447, at *38-39.

Sherrod's proposed testimony is that the chassis design claimed in the '646 Patent has been universally adopted and used in the adult protective underwear industry, ergo, Kimberly-Clark's adult protective underwear products implement that design. Sherrod has extensive experience in the area of incontinence-product development, which includes working for Kimberly-Clark. (Sherrod Report 2-3). This experience is sufficient support to establish the admissibility of his opinion. *See id.* at *39 (admitting opinion of commercial-success expert, who opined that the patent-at-issue had been widely implemented in numerous notebook computers he had analyzed, based on expert's experience with a large number of notebook computers).

Overall, if after SCA puts on its proof First Quality does not believe that SCA has met its burden of establishing commercial success as laid out in *Demaco*, First Quality can move for judgment as a matter of law. *See* Fed. R. Civ. P. 50(a). At this point, however, the Court will not preclude Sherrod from offering testimony concerning commercial success merely because First Quality does not believe his testimony alone establishes it.

### 3.  *SCA's Motion to Preclude Expert Testimony of Daniel D. Gardner, Jr. on the Issue of Infringement of the Patent-in-Suit*

In his rebuttal report, First Quality's expert Daniel D. Gardner, Jr. ("Gardner") contends that none of Accused Products infringe the '646 Patent. (Gardner Report 1, DN 100-12). During his deposition on December 18, 2012, however, Gardner—upon the advice of First Quality's counsel—refused to answer questions concerning SCA-AP-023. Gardner refused to discuss whether the elastics on the front part of SCA-AP-023 are designed to hold the end part of the absorbent core against the wearer's body:

> Q: In your expert opinion, I want you to tell me whether the elastics on the front of that product are designed to hold the end part of the absorbent core against the wearer's body?
>
> MR. MACEDO: Objection to form and instruction not to answer. It's outside the scope of his opinion. He is not being offered at trial for those opinions and he is not going to answer those questions.
>
> Q: Are you accepting that instruction?
>
> A: Yes

(Gardner Dep. 57:1-11, Dec. 18, 2012, DN 100-13). Gardner also refused to address whether SCA-AP-023 has an elastically stretchable region that covers almost all of the front part of the product:

> Q: Does [SCA-AP-023] have an elastically stretchable region that covers almost all of the front part of the product?
>
> MR. MACEDO: Objection to form. He is not offering an opinion on that subject, so I instruct him not to answer.
>
> Q: Are you following that instruction?
>
> A: I am.
>
> Q: Could you just, for the camera, take that portion and can you stretch it?
>
> MR. MACDEO: No. Objection to form. He is not offering an opinion on that so he is not going to be answering questions or presenting demonstratives for you.

(Gardner Dep. 121:14-122:4). Indeed, as far as the Court can tell, each time SCA's counsel brought up SCA-AP-023, First Quality's counsel made clear that Gardner would not answer questions about it. (Gardner Dep. 57:1-60:8; 121:14-122:17).

Now, SCA asks the court to preclude all of Gardner's testimony or his testimony concerning SCA-AP-020, 023, 050, and 056 or, "at the absolute minimum," his testimony concerning SCA-AP-023. (Pls.' Mem Supp. Mot. Preclude Expert Testimony of Daniel D. Gardner, Jr. on Infringement 1, DN 100-1). SCA notes that the Federal Rules of Civil Procedure require that each testifying expert prepare and sign "a complete statement of all opinions to be expressed and the basis and reasons for them [and] the facts or data considered by the witness in forming them[,]" and allow parties to depose experts who may testify at trial. Fed. R. Civ. P.

26(a)(2)(B)(i)-(ii); Fed. R. Civ. P. 26(b)(4)(A). Relying on these rules, SCA argues that exclusion is appropriate. First Quality contends that SCA's motion is either a disguised motion to compel under Federal Rule of Civil Procedure 37(a)(1) that is procedurally improper because SCA failed meet and confer with First Quality before filing it or one that seeks sanctions under Rule 37(c) based on an alleged violation of Rules 26(a) and 26(b).[4] Either way, First Quality argues that SCA's motion is procedurally improper and overblown.

Regardless of the rule upon which SCA's motion is based, "[a] person may instruct a deponent not to answer only when necessary to preserve a privilege, to enforce a limitation ordered by the court, or to present a motion under Rule 30(d)(3)." Fed. R. Civ. P. 30(c)(2). Numerous courts have held that it is improper for a witness not to answer a question on the basis of relevancy. *See, e.g.*, *Ethicon Endo-Surgery v. U.S. Surgical Corp.*, 160 F.R.D. 98, 99 (S.D. Ohio 1995), *vacated on other grounds*, 93 F.3d 1572 (Fed. Cir. 1996); *Banks v. Office of the Senate Sergeant-at-Arms*, 222 F.R.D. 1, 6 (D.D.C. 2004). When examining counsel asks a deponent an irrelevant question, opposing counsel should enter an objection and allow the deponent to answer. *Ethicon Endo-Surgery*, 160 F.R.D. at 99; Fed. R. Civ. P 30(c)(2) ("the examination still proceeds . . . .").

First Quality's counsel's instruction to Gardner was not based on any of the grounds listed in Rule 30(c)(2). Rather, it seems apparent that First Quality's counsel instructed Gardner not to answer the questions or perform the demonstrations SCA's counsel requested because he thought the information sought was irrelevant. The Court agrees with SCA that this conduct was

---

[4] Fed. R. Civ. P. 37(a)(1) requires that a motion to compel discovery "must include a certification that the movant has in good faith conferred or attempted to confer with the person or party failing to make disclosure or discovery . . . ." As explained below, the Court relies on Fed. R. Civ. P. 30(d)(2) to resolve this dispute, and that rule contains no meet-and-confer requirement. 7 James Wm. Moore et al., *Moore's Federal Practice* § 30.43[5] (3d ed. 1997).

inappropriate. Furthermore, the Court believes that the information SCA's counsel sought was within the scope of discovery permitted by Federal Rule of Civil Procedure 26(b)(1). Rule 26(b)(1) provides, "[p]arties may obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense and proportional to the needs of the case . . . . Information within this scope of discovery need not be admissible in evidence to be discoverable." Fed. R. Civ. P. 26(b)(1). "The scope of examination permitted under Rule 26(b) is broader than that permitted at trial. The test is whether the line of interrogation is reasonably calculated to lead to the discovery of admissible evidence." *Lewis v. ACB Bus. Servs., Inc.*, 135 F.3d 389, 402 (6th Cir. 1998) (internal quotation marks omitted) (citation omitted). Moreover, as the Sixth Circuit has recognized, "[t]he scope of discovery is, of course, within the broad discretion of the trial court." *Id.* (citation omitted).

SCA's claim is that the Accused Products infringe the '646 Patent. First Quality's counsel and Gardner both made clear during Gardner's deposition that he would not offer an infringement opinion on SCA-AP-023, one of the Accused Products. Gardner testified:

> Q: Have you formulated an opinion as to whether [SCA-AP-023] infringes the ['646 Patent] or not?
> A: No.

(Gardner Dep. 56:19-22). Yet, in his report, Gardner specifically opines that SCA-AP-023 meets neither the sealing abutment limitation nor the stretching and contraction power limitation and, as a result, does not infringe the '646 Patent. (Gardner Report 91-96). Besides explaining that Sherrod's testing is insufficient to show sealing abutment, Gardner notes that Sherrod's observation that "when examining each of [the Accused Products], one of ordinary skill in the art would determine that all of the accused products are designed to fit against the body of the wearer and reduce leakage[]" is "inconclusive" as to whether the sealing abutment limitation is

met.  (Gardner Rep. 92).  To the extent the disputed questions were directed at probing Gardner's conclusion on this point, they are clearly proper.

First Quality asserts that Gardner's refusal to testify as to whether SCA-AP-023 has an elastically stretchable region covering almost of all its front part is inconsequential because it is not contesting those issues.  Additionally, First Quality argues that, regardless, this type of questioning is improper because Gardner did not rely on SCA-AP-023 in rendering his opinions on the other Accused Products.  The Court finds these arguments unpersuasive. According to SCA, SCA-AP-023 most closely resembles the preferred embodiment of the patent-in-suit, and SCA's counsel's questions were directed at revealing inconsistencies in Gardner's analysis of other Accused Products and undermining his non-infringement position.  In this way, the disputed questions relate to the credibility and reliability of Gardner's methodology, which SCA had a right to explore when deposing him.  First Quality was not entitled to unilaterally cut off SCA's opportunity to obtain information that would allow it to test Gardner's opinions.

The question now is how this discovery dispute should be resolved.  Under Federal Rule of Civil Procedure 30(d)(2) "[t]he court may impose an appropriate sanction—including the reasonable expenses and attorney's fees incurred by any party—on a person who impedes, delays, or frustrates the fair examination of the deponent." Fed. R. Civ. P. 30(d)(2).  Typically, where a deponent improperly refuses to answer a question, the examining party files a motion to compel under Rule 37(a)(1).  *See, e.g.*, *Ethicon Endo-Surgery*, 160 F.R.D at 99; *In re Omeprazole Patent Litig.*, 227 F.R.D 227, 228-39 (S.D.N.Y. 2005).  In *Spencer v. United States*, No. 02-2106-CM, 2003 U.S. Dist. LEXIS 25277 (D. Kan. Dec. 16, 2003), however, the plaintiff moved to strike the testimony of an expert who refused to answer a deposition question, and the

court ordered the expert to appear for further deposition in lieu of precluding the expert's testimony. *Id.* at *33-35.

The Court finds the approach taken in *Spencer* to be prudent and declines to preclude Gardner's testimony at this point. In this case, like *Spencer*, SCA moved to strike all of Gardner's testimony. They did not file a motion to compel or expressly request sanctions under Rule 30(d)(2). SCA deposed Gardner extensively and only takes issue with a few pages of his testimony. Moreover, the Court views the practice of moving to preclude a deponent from testifying at trial upon the deponent's failure to answer a question, as opposed to first moving to compel an answer, to be against the spirit of the Federal Rules of Civil Procedure, which "should be construed, administered, and employed by the court and the parties to secure the just, speedy, and inexpensive determination of every action and proceeding." Fed. R. Civ. P. 1. Additionally, according to First Quality, if SCA had conferred with its counsel before filing the motion, "the parties would have resolved these issues without further assistance by the Court, as they have done with every other discovery dispute in this case." (Defs.' Opp'n Pls.' Mot. Preclude Expert Testimony of Daniel D. Gardner, Jr. on Infringement 10, DN 105). That is not to say the actions of First Quality's counsel should go unaddressed, as they clearly violated Rule 30(c)(2) and have only served to prolong a case that is already long in the tooth.

In light of the above, the parties are ordered to confer within 14 days and attempt to resolve Gardner's failure to answer the disputed questions, after which point the Court will schedule a telephonic conference with the parties. If the parties are unable to resolve the issue, First Quality shall produce Gardner for further deposition on the questions he refused to answer and reasonable follow-up questions. Additionally, under Rule 30(d)(2), if further deposition is necessary, the costs of the deposition, including the fee of the court reporter, the transcript of the

deposition, and attorneys' fees incurred in taking the deposition, shall be borne by First Quality. SCA's counsel shall submit to the Court, and serve upon First Quality's counsel, a statement of the above costs within 14 days after the deposition (if necessary). First Quality's counsel will then have 14 days to show cause why it should not be required to pay the costs submitted.

### B.    First Quality's Motion for Partial Summary Judgment of Non-Infringement

At First Quality's request, the Court held oral argument on this motion on December 2, 2016. (Order, DN 158). At the end of the hearing, SCA's counsel asked for permission to file a "short supplemental brief." (Mot. Hr'g Tr. 77:12-15, DN 160). First Quality did not object, so the Court set a briefing schedule, allowing SCA to file a supplemental brief and First Quality to respond. (Mot. Hr'g Tr. 77:17-19; Agreed Order, DN 163). Both parties have filed their supplements; therefore, this motion is ripe for adjudication.

The summary judgment standard in patent cases is the same as in all other cases. *Nike, Inc. v. Wolverine World Wide, Inc.*, 43 F.3d 644, 646 (Fed. Cir. 1994); *Conroy v. Reebok Int'l, Ltd.*, 14 F.3d 1570, 1575 (Fed. Cir. 1994). Rule 56(a) instructs courts to grant summary judgment "[i]f the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party bears the initial burden of stating the basis for the motion and identifying evidence in the record that demonstrates an absence of a genuine dispute of material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). If, however, the moving party does not bear the burden of proof on the issue for which it seeks summary judgment, it may meet its burden by showing "that there is an absence of evidence to support the nonmoving party's case." *Id.* at 325. Once the moving party satisfies its burden, the non-moving party must then produce specific evidence proving the

existence of a genuine dispute of fact for trial. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986).

While courts must view the evidence in the light most favorable to the non-moving party, the non-moving party must do more than merely show the existence of some "metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986) (citation omitted). Instead, the non-moving party must present specific facts proving that a genuine factual dispute exists by "citing to particular parts of the materials in the record" or by "showing that the materials cited do not establish the absence . . . of a genuine dispute . . . ." Fed. R. Civ. P. 56(c)(1). "The mere existence of a scintilla of evidence in support of the [non-moving party's] position will be insufficient" to overcome summary judgment. *Anderson*, 477 U.S. at 252. When summary judgment involves the question of non-infringement, as does First Quality's motion, it is appropriate only if "[n]o reasonable jury could find infringement." *IMS Tech., Inc., v. Haas Automation, Inc.*, 206 F.3d 1422, 1429 (Fed. Cir. 2000) (citation omitted).

Infringement analysis involves two steps. *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 976 (Fed. Cir. 1995) (en banc), *aff'd*, 517 U.S. 370 (1996). "First, the court determines the scope and meaning of the patent claims asserted . . . ." *Cybor Corp. v. FAS Techs., Inc.*, 138 F.3d 1448, 1454 (Fed. Cir. 1998) (en banc) (internal citation omitted). This step is an issue of law. *Markman*, 52 F.3d at 970-71. Second, the court compares the properly construed claims to the accused device, which is a factual inquiry. *Id.* at 976; *Minn. Mining & Mfg. Co. v. Johnson & Johnson Orthopedics, Inc.*, 976 F.2d 1559, 1570 (Fed. Cir. 1992). To infringe, the accused device must meet each claim element (or limitation) either literally or under

the doctrine of equivalents.[5] *Seal-Flex, Inc. v. Athletic Track & Court Constr.*, 172 F.3d 836, 842 (Fed. Cir. 1999). Literal infringement exists where each and every element of a claim is found in the accused device. *DeMarini Sports, Inc. v. Worth, Inc.*, 239 F.3d 1314, 1331 (Fed. Cir. 2001) (citation omitted). A dependent claim includes all of the limitations of the claim from which it depends. 35 U.S.C. § 112(d)-(e). Thus, if an independent claim is not infringed, all claims that depend on it are not infringed. *Streamfeeder, LLC v. Sure-Feed Sys., Inc.*, 175 F.3d 974, 985 (Fed. Cir. 1999).

Only a few of the limitations found in claims 1 and 15 are relevant for purposes of the present motion: the requirements of claim 1 that the pants-type diaper have (1) "at least one elastically stretchable region covering *essentially the whole* of at least one of the respective front and back parts" (the "essentially the whole limitation") and (2) that "at least one of the respective end parts of the absorbent layer [be] *disposed within* one of said elastically stretchable regions" (the "disposed within limitation"); and the requirements of claim 15 that (1) "at least one of the respective front and back parts [have] at least one elastically stretchable region" and (2) "at least one of the respective end parts of the absorbent layer [be] disposed within one of said elastically stretchable regions." *Id.* at col. 8, ll. 63-67, col. 9, ll.1-4, col. 10, ll. 21-27. In other words, claim

_____

[5] First Quality's motion concerns only literal infringement. In SCA's revised infringement contentions, SCA reserved "[t]he right to contend that infringement is under the doctrine of equivalents . . . with the exception of the limitations of 'elastically stretchable region(s),' 'stretchable region(s)' and 'elastically stretchable region covering essentially the whole of at least one of the respective front and back parts' as construed by the Court.'" (SCA's Revised Infringement Contentions, Charts for Design 1 n.2, DN 83-5). In its supplemental brief, SCA "admits that it cannot assert the doctrine of equivalents with respect to the meaning of an 'elastically stretchable region' due to the court's finding of prosecution history disclaimer, but that disclaimer does not extend to whether something is 'disposed within' the elastically stretchable region." (Pls.' Suppl. Br. Opp'n Defs.' Mot. Summ. J. 18-19, DN 164 [hereinafter Pls.' Suppl. Br.]). Of course, First Quality takes issue with this position. (Defs.' Resp. Pls.' Suppl. Br. 14-15, DN 167). The Court, however, views this as a fight best left for another day, as the parties have not briefed the doctrine of equivalents and First Quality's motion does not concern it.

1 requires that the front or rear end part of a product's absorbent layer be disposed within an elastically stretchable region that covers essentially the whole of its front or back part, while claim 15 merely requires that the front or rear end part of a product's absorbent layer be disposed within an elastically stretchable region located in its front or back part. The Court previously construed the relevant terms as follows:

| Claim Term(s) | Claim Construction |
|---|---|
| "elastically stretchable region(s)" | "an area bounded by elastic elements/material incorporating a continuous number of elastic elements/material that is capable of being stretched." |
| "elastically stretchable region covering essentially the whole of at least one of the respective front and back parts" | "an area bounded by elastic elements/material incorporating a continuous number of elastic elements/material that is capable of being stretched covering almost all or substantially all of the front or the back part." |
| "end parts of the absorbent layer . . . disposed within . . . elastically stretchable region(s)." | "its ordinary and customary meaning as understood in the context of the claimed invention by one skilled in the art at the time of the invention." |

(Claims Construction Mem. Op. & Order 12, 16, 18, DN 61).

The parties grouped the products accused of infringing the '646 Patent into nine representative categories. First Quality's motion is directed at eight of those product categories: (1) SCA-AP-020; (2) SCA-AP-050; (3) SCA-AP-056; (4) SCA-AP-016; (5) SCA-AP-051; (6) SCA-AP-001; (7) SCA-AP-004; and (8) SCA-AP-010. (Defs.' Mem. Supp. Mot. Partial Summ. J. Non-Infringement 1, DN 98-1 [hereinafter Defs.' Mot. Partial Summ. J.]).

As will be shown below, the ultimate question is whether Sherrod's opinion that the products represented by these eight categories meet the claims terms above is sufficient to preclude summary judgment. "[I]t is well settled that an expert's unsupported conclusion on the ultimate issue of infringement is insufficient to raise a genuine [dispute] of material fact."

*Arthur A. Collins, Inc. v. N. Telecom Ltd.*, 216 F.3d 1042, 1046 (Fed. Cir. 2000) (citation omitted). For an expert's opinion to create a genuine dispute of material fact, the expert must "set forth the factual foundation for his opinion . . . in sufficient detail for the court to determine whether that factual foundation would support a finding of infringement under the claim construction adopted by the court, with all reasonable inferences drawn in favor of the nonmovant." *Id.* at 1047-48. A party cannot avoid this rule merely by framing "the expert's conclusion as an assertion that a particular critical claim limitation is found in the accused device." *Id.* at 1046.

### 1. *Design 1 Products*

The parties refer to SCA-AP-020, 050, and 056 as "Design 1 products." (Sherrod Decl. 18). All of the Design 1 products have elastic threads in their respective front and back parts, but the threads are cut such that they retract towards the side seams and do not come into contact with the products' absorbent layers. (Defs.' Mot. Partial Summ. J. 8; Sherrod Decl. 12-14; Sherrod Dep. 223:16-19; Gardner Report 63). Nevertheless, they are accused of infringing claims 1 and 15 as well as various dependent claims of the '646 Patent. Both claims 1 and 15 recite the disposed within limitation, while only claim 1 recites the essentially the whole limitation. Therefore, if the Court determines that no reasonable jury could find that the Design 1 products meet the disposed within limitation, summary judgement of non-infringement is appropriate because that limitation is found in both independent claims.

### a. **Disposed Within Limitation**

In support of its position that a genuine factual dispute exists as to whether each Design 1 product meets the disposed within limitation, SCA offers Sherrod's opinion. In his first declaration, Sherrod opines that "[o]ne of ordinary skill in the art visually inspecting the Accused

Products would determine that [the Design 1 products have] an absorbent layer which is disposed within at least one of the areas bounded by elastic elements or elastic material incorporating a continuous number of elastic elements or elastic material that is capable of being stretched . . . ." (Sherrod Decl. 34). Specifically, Sherrod notes that the front end parts of the Design 1 products' absorbent layers extend into the areas he labeled as "elastically stretchable region A" on each product, while the rear end parts of the Design 1 products' absorbent layers extend into the areas he labeled as "elastically stretchable region C" on each product. (Sherrod Decl. Ex. B-13, at 3, 11, DN 107-36). Sherrod's version of SCA-AP-050 is reproduced below as an example.



Exhibit B-1
SCA-AP-050

Sherrod recognizes that the elastics in SCA-AP-050 are "deactivated" (i.e., cut) over the absorbent pad in the front and back parts, that there are areas without elastic in the region he labeled as an elastically stretchable region, and that no elastics go over the absorbent pad.

(Sherrod Decl. 12-14; Sherrod Dep. 223:16-19; Gardner Report 63). Consider another look at SCA-AP-050; the shaded area indicates where elastic is present:



(Defs.' Suppl. Br. 11, DN 167). The same is true for SCA-AP-020 and 056. For example, Sherrod states that in SCA-AP-020, "[t]he absorbent pad extends halfway into the front part of the product . . ." and that "[t]he elastic threads are deactivated over the absorbent pad on the front part." (Sherrod Decl. 12). Additionally, Sherrod explains that "[t]he absorbent pad extends halfway into the back part of the product" and that "[t]he elastic threads are deactivated over the absorbent pad in the back part." (Sherrod Decl. 12-13). Again, in this instance, deactivated

simply means cut. First Quality has provided an annotated photograph of SCA-AP-020 in support of its position, which SCA apparently does not dispute:



For each Design 1 product, Sherrod states in his declaration that the elastics are deactivated (cut) over the front and back end parts of the absorbent pad, and he has testified that there is no difference between an area where elastics have been deactivated and an area where there are simply no elastics. (Sherrod Decl. 12-14; Sherrod Dep. 596:18-22). Yet, in each Design 1 product, Sherrod includes these areas of no elastic in larger "elastically stretchable regions" and concludes that because the end parts of the products' absorbent layers extended into those larger regions, each meets the disposed within limitation. (Sherrod Decl. 12-14, 34; Sherrod Decl. Ex. 5, DN 108-16; Sherrod Decl. Ex. 6, DN 108-17; Sherrod Decl. Ex. 7, DN 108-18). Sherrod fails to explain how one of ordinary skill in the art could reach such a conclusion in light of the Court's construction of the phrase elastically stretchable region as an "an area bounded by elastic elements/material incorporating a continuous number of elastic elements/material that is capable of being stretched." (Claims Construction Mem. Op. & Order 12). Because the areas in the front and back of each Design 1 product where the pad is located have no elastic, Sherrod's opinion flies in the face of the Court's construction of the patent limitation that the absorbent pad be disposed within an elastically stretchable region.

In its *Markman* order, the Court found that SCA "[d]isclaimed any interpretation of 'elastically stretchable region(s)' . . . as including considerable areas of non-elastic material that are not covered by elastic elements or materials, i.e. gaps." (Claims Construction Mem. Op. & Order 12).

The areas of the Design 1 products Sherrod labeled as elastically stretchable regions, however, contain gaps where no elastic is present. Simply put, an area that includes a considerable gap without elastic is not an elastically stretchable region because the elastic is discontinuous. Sherrod's opinion lacks support and directly contravenes the Court's claim construction opinion because the Design 1 products have significant regions of *no elastic* in their front and back parts, and these "gaps" are where the end parts of the products' absorbent layers are disposed, i.e., located.

SCA contends that summary judgment is inappropriate because there is a genuine factual dispute as to whether the deactivation of elastic elements over the core of the Design 1 products has such an effect on the products that the elastic elements can no longer be considered part of an elastically stretchable region. Essentially, SCA's argument is that the regions Sherrod labeled as elastically stretchable still function as elastically stretchable regions despite containing deactivated elastics. According to Sherrod, "[t]he deactivation of elastic threads does not serve to make [an] area not elastically stretchable . . . ," but the only basis he has offered for this position are admissions of SCA's agents that deactivating a product's elastic threads does not affect performance and that the elastic threads are cut for aesthetic purposes only. (Sherrod Decl. 32; Pls.' Opp'n Defs.' Mot. Partial Summ. J. 13-14, DN 108). From this, Sherrod concludes that it is irrelevant that the Design 1 products' elastics are deactivated over their absorbent layers because the remaining elastics still function to hold the end parts of the pads

against the user's body.  (Sherrod Dep. 353:6-354:3).[6]  The question, however, is not whether regions that have no elastic in them function as regions that do, but whether SCA has produced evidence showing that the end parts of the Design 1 products' absorbent layers are disposed within elastically stretchable regions defined by the Court.  In that regard, SCA seeks to allow its expert to create a factual dispute precluding summary judgment.  To do so, however, would ignore the Court's construction of the phrase elastically stretchable region.

SCA attempts to sidestep the fact that Sherrod includes considerable gaps containing no elastic within the areas of the Design 1 products he labeled as elastically stretchable regions by claiming that the Court construed the phrase elastically stretchable region as "a region, bounded by elastic elements or material, consisting of elastic elements/materials arranged continuously— *from top-to-bottom*."  (Pls.' Opp'n Defs.' Mot. Partial Summ. J. 14).  From this, SCA contends that discontinuity of elastics from left-to-right does not preclude a finding that the disposed within limitation is met.  (Pls.' Opp'n Defs.' Mot. Partial Summ. J. 14-15).  As noted above, the Court's claim construction specifically states that an elastically stretchable region may not include considerable areas of non-elastic material, i.e., gaps.  The Court did not distinguish between vertical gaps and horizontal gaps, and the phrase "from top-to-bottom" appears nowhere in its opinion.  In any event, the areas of the Design 1 products Sherrod labeled as elastically stretchable regions contain considerable gaps with no elastic—horizontal, vertical, or diagonal.  Sherrod simply labeled the diapers in a way that ignores the meaning of elastically stretchable region.

---

[6]  SCA appears to be injecting the doctrine of equivalents into a straightforward literal infringement analysis.  Again, the doctrine of equivalents is not applicable here.  Indeed, in his initial report, Sherrod stated:  "I have not been asked to analyze infringement under the doctrine of equivalents . . . and "[i]t is my understanding that to literally infringe a claim, an accused product must literally meet every limitation or requirement of the claim." (Sherrod Report 5-6, DN 107-3).

Not to worry, SCA has a new theory, which it raised for the first time at the December 2016 hearing:  SCA-APA-050 meets the disposed within limitation because the end parts of its absorbent pads are disposed within an elastically stretchable region like a "key disposed in a lock."  (Mot. Hr'g Tr. 39:17-19; Pls.' Suppl. Br. 15-18).  SCA presents the following representation of SCA-AP-050 in its supplemental brief:



The blue rectangle represents the end part of SCA-AP-050's absorbent pad (the "key"), while the green region represents the elastically stretchable region (the "lock").  SCA further notes that "[t]he term 'disposed within' is a term of art used by patent attorneys and engineers to mean that an object is placed within or located in something."  (Pls. Suppl. Br. 13).  Sherrod apparently agrees.  Along with its short supplemental brief, SCA submitted a new declaration from him.  (Sherrod Suppl. Decl., DN 164-1).  In this declaration, Sherrod relies on the above representation of SCA-AP-050 and theorizes:

> One of ordinary skill in the art would understand the term 'disposed within' to be a generic broad term to indicate that something is placed or positioned within something else.  If the Court were to limit the elastically stretchable region to the

green area below, one skilled in the art would readily conclude that the end part of the absorbent pad is disposed within the green region, just as a key is disposed in a lock.

(Sherrod Suppl. Decl. 3).

SCA contends that, all along, First Quality has been attempting to re-litigate a battle it lost at claim construction, namely that "disposed within" means "under" the elastics. (Pls.' Suppl. Br. 15). During claim construction, First Quality asked the Court to construe the phrase "end parts of the absorbent layer . . . disposed within . . . elastically stretchable region(s)" as requiring elastically stretchable elements or material to "extend over" the ends of the absorbent pad. (Claims Construction Mem. Op. & Order 16-17). The Court declined to do so and explained, "given that the parties do not dispute the construction of the term absorbent pad and in light of the Court's construction of the phrase 'elastically stretchable region,' the Court accords the phrase . . . its ordinary and customary meaning as understood in the context of the claimed invention by one skilled in the art at the time of the invention." (Claims Construction Mem. Op. & Order 17-18).

SCA misses the point. An elastically stretchable region is an area bounded by elastic elements/material incorporating a **continuous** number of elastic elements/material that is capable of being stretched. There is ***no elastic*** where the end parts of the Design 1 products' absorbent layers are located—either over or under the absorbent layers. The end parts are located in a gap, devoid of elastic elements or material, not an elastically stretchable region. No reasonable jury could conclude otherwise. Therefore, summary judgment of non-infringement is appropriate with regard to the Design 1 products on this basis alone.

### b.    Essentially the Whole Limitation

Additionally, none of the Design 1 products meet the essentially the whole limitation; therefore, they do not infringe claim 1.  The Court previously construed the phrase "elastically stretchable region covering essentially the whole of at least one of the respective front and back parts" as "an area bounded by elastic elements/material incorporating a continuous number of elastic elements/material that is capable of being stretched covering almost all or substantially all of the front or the back part."  (Claims Construction Mem. Op. & Order 14).  As recognized in the claim construction opinion, SCA has made clear that an elastically stretchable region covering essentially the whole of the front or back part of a diaper is a continuous region incorporating numerous elastic elements that ***does not*** contain significant gaps; it is a region that is almost all elastic.[7]

In its supplemental brief, SCA does not meaningfully address whether the Design 1 products meet this limitation.  Indeed, during oral argument, SCA's counsel conceded that, at least as to SCA-AP-050, under its key-in-a-lock theory, "we lose on Claim 1, okay?  We lose on Claim 1 because it doesn't cover essentially the whole, okay?" (Mot. Hr'g Tr. 42:10-19).  In its original opposition to First Quality's motion, however, SCA claims that Sherrod's first declaration creates a genuine factual dispute precluding summary judgment.  In his opinion:

> [o]ne of ordinary skill in the art visually inspecting the Accused Products would determine that each of the Design 1 Accused Products . . . has at least one area bounded by elastic elements or elastic material incorporating a continuous number

---

[7] Specifically, to overcome prior art, SCA "[a]rgued that an elastically stretchable region that covers essentially the whole of the front part of the diaper must be a continuous region incorporating numerous elastic elements."  (Claims Construction Mem. Op. & Order 9).  Moreover, as explained above, SCA noted that the significant gaps between the elastic elements found in the front and back parts in the prior art rendered erroneous the Patent Examiner's conclusion that the prior art disclosed an elastically stretchable covering essentially the whole of the front or back parts.

of elastic elements or elastic material that is capable of being stretched and that covers almost all of at least one of the respective front and back parts.

(Sherrod Decl. 31). Sherrod asserts that his physical inspection of the Design 1 products revealed that elastically stretchable regions cover the areas between the side seams on their front parts and that elastic threads are located continuously in the front parts of the products from their waist parts to the bottom of their front parts. (Sherrod Decl. 31-32). Meanwhile, SCA has provided a declaration from Gardner in which he states that none of the products meet the essentially the whole limitation because a significant portion of the products' front and back parts contain no elastic material. (Gardner Decl. 15-17, DN 98-2)

As noted above, Sherrod has recognized that in SCA-AP-020, "[t]he absorbent pad extends halfway into the front part of the product" and that "[t]he elastic threads are deactivated over the absorbent pad on the front part." (Sherrod Decl. 12). He has also explained that "[t]he absorbent pad extends halfway into the back part of the product" and that "[t]he elastic threads are deactivated over the absorbent pad in the back part." (Sherrod Decl. 12-13). An illustration of SCA-AP-020 is provided below.



As for SCA-AP-050, Sherrod says that "[t]he front end of the absorbent pad extends into the front part of the product" but that "[t]he bottom approximately six or seven threads are deactivated over the absorbent pad on the front part." The front part of SCA-AP-050 is reproduced below.



Similarly, as to SCA-AP-056, Sherrod states that "[t]he front end of the absorbent pad extends into the front part of the product"; that "[t]he elastic threads are deactivated over the absorbent pad on the front part"; and that the elastic threads are deactivated over the absorbent pad in the back part. (Sherrod Decl. 14). An image of SCA-AP-056 is provided below.



From these images, it is apparent that SCA-AP-020, 050, and 056 do not have elastically stretchable regions covering almost all of their front or back parts. They reveal that each product contains a significant gap of no elastic in its front and back parts comprising the entirety of the area containing its absorbent pad. Given the gaps created by deactivating those elastic threads, no reasonable jury could conclude that all or almost all of their fronts or backs are elastically

stretchable regions, in light of Sherrod's admission that deactivated elastic is equivalent to no elastic. (Sherrod Dep. 596:18-22).

In sum, SCA has failed to produce evidence that would allow a reasonable jury to conclude that any of the Design 1 products literally meet the disposed within limitation or the essentially the whole limitation. Summary judgment of non-infringement with respect to the Design 1 products is therefore appropriate.

### 2. *Design 2 Products*

#### a. SCA-AP-016 & 051

SCA-AP-016 and 051 are accused of infringing claim 15 and various dependent claims of the '646 patent. The only issue for the Court to resolve is whether SCA has produced evidence creating a genuine factual dispute as to whether these products literally meet the disposed within limitation. For many of the same reasons that there is no genuine dispute as to whether the Design 1 products literally meet the disposed within limitation, there is no genuine dispute that SCA-AP-016 and 051 fail to literally meet that limitation.

SCA barely mentions these products in its supplemental brief. In its initial opposition to First Quality's motion, SCA relies on Sherrod's first declaration as evidence that SCA-AP-016 and 051 meet the disposed within limitation. In it, Sherrod opines that "[o]ne of ordinary skill in the art visually inspecting the Accused Products would determine that each of the . . . Design 2 Accused Products [has] an absorbent layer which is disposed within at least one of the areas bounded by elastic elements or elastic material incorporating a continuous number of elastic elements or material that is capable of being stretched." (Sherrod Decl. 34). Sherrod asserts that the products meet this limitation because the front end parts of their absorbent layers extend into the areas he labeled as "elastically stretchable region B" on the front part of each product, and

the rear end part of the absorbent layers extend into the areas he labeled as "elastically stretchable region D" on the back part of each product. (Sherrod Decl. Ex. B-14, at 4, DN 107-37). Sherrod's annotated version of SCA-AP-016 is reproduced below and illustrates his opinion:



Exhibit D-1
SCA-AP-016

Sherrod has marked the front and rear thigh elastics of SCA-AP-016 as elastically stretchable regions B and D—the same is true for SCA-AP-051. In describing SCA-AP-016 and 051, however, Sherrod notes that "[t]he elastic threads in [elastically stretchable regions B and

D] are deactivated over the absorbent pad on the front and back parts." (Sherrod Decl. 16-17). Again, according to Sherrod, deactivated elastic is the same as having no elastic. (Sherrod Dep. 596:18-22). Like the Design 1 products, the elastics have been cut such that they retract towards the products' side seams. (Pls.' Opp'n Defs.' Mot. Partial Summ. J. 20). Thus, there are considerable gaps with no elastic in the areas Sherrod labeled as elastically stretchable regions B and D. Sherrod's opinion that SCA-AP-016 and 051 meet the disposed within limitation again runs contrary to the Court's claim construction opinion and is insufficient to create a genuine dispute of material fact; no reasonable jury could conclude that SCA-AP-016 and 051 infringe claim 15 based on his opinion alone. Moreover, SCA's argument that summary judgment is inappropriate because regions B and D function as elastically stretchable regions despite containing deactivated elastics are again unpersuasive as the basis of the present motion is literal infringement. As a result, summary judgment of non-infringement with respect to SCA-AP-016 and 051 is appropriate.

### b. SCA-AP-001 & 004

Like SCA-AP-016 and 051, SCA-AP-001 and 004 are accused of infringing claim 15 and various dependent claims of the '646 patent. These products are addressed separately because the part of the thigh elastics transecting the products' absorbent layers are not cut or otherwise deactivated. The parties' arguments center on whether these products have elastically stretchable regions in either their front or back parts and whether three elastic strands are enough to constitute an elastically stretchable region.

For SCA-AP-001 and 004 to infringe claim 15, they must have an elastically stretchable region in either their front or back parts within which one of the end parts of their absorbent layers is disposed. *See* U.S. Patent No. 6,375,646 col. 10, ll. 21-26. The Court did not give the

terms "front part" or "back part" any special meaning in its *Markman* opinion. This is because, as First Quality recognizes, the parties did not dispute the meaning of the terms at that time. According to First Quality, SCA's initial, pre-*Markman* infringement contentions were consistent with the plain and ordinary meaning of the terms "front part" and "back part." After the Court issued its claim construction order, however, SCA served revised infringement contentions in which SCA claimed that the front and back parts were longer than previously labeled and, conveniently, encompassed the thigh elastics in SCA-AP-001 and 004. (SCA's Revised Infringement Contentions 52-56).

First Quality maintains that SCA's shifting position creates a claim construction issue that the Court must now resolve. SCA, on the other hand, casts the parties' disagreement as a factual dispute that must be resolved by the jury. It contends that the parties agree that the front part is the part of the diaper facing forward on the wearer, but disagree as to the boundary between the front and the crotch parts of the accused products and whether the thigh elastics fall within the front part when the claim language is applied to the accused products.[8]

The Court agrees with First Quality that it must now construe the terms "front part" and "back part" because there is a dispute as to the meaning and scope of those terms, but it is also mindful that claim construction is necessary to give meaning to claim terms, not to resolve underlying questions of liability. *See Am. Piledriving Equip. v. Geoquip, Inc.*, 637 F.3d 1324, 1331 (Fed Cir. 2011) (citation omitted); *O2 Micro Int'l Ltd. v. Beyond Innovation Tech. Co.*, 521 F.3d 1351, 1362 (Fed. Cir. 2008) ("[C]laim construction is a matter of resolution of disputed meanings and technical scope, to clarify and when necessary to explain what the patentee

---

[8] As noted above, claim 15 requires only that there be an elastically stretchable region in either the front *or* back part in which the end part of a product's absorbent layer is disposed. In turn, SCA's submission focuses only on the front part of the accused products.

covered by the claims, for use in the determination of infringement." (quoting *U.S. Surgical Corp. v. Ethicon, Inc.*, 103 F.3d 1554, 1568 (Fed. Cir. 1997))). Nevertheless, "[w]hen the parties present a fundamental dispute regarding the scope of a claim term, it is the court's duty to resolve it." *O2 Micro Int'l Ltd.*, 521 F.3d at 1362. Moreover, district courts should resolve claim construction disputes regardless of when they arise. *See, e.g.*, *Pressure Prods. Med. Supplies, Inc. v. Greatbach Ltd.*, 599 F.3d 1308, 1316 (Fed. Cir. 2010); *see also O2 Micro Int'l Ltd.*, 521 F.3d at 1362.

SCA's expert refers to the "front part" as, "[t]he portion of the product located between the side seams and generally extending from the waist to the beginning of the crease of the leg on the front of the wearer's body, and the "back part" as, "[t]he portion of the product located between the side seams and generally extending from the waist to the end of the curve of the buttocks on the back of the wearer's body." (Sherrod Decl. 10). Sherrod used this definition to reach his conclusion that SCA-AP-001 and 004 meet the disposed within limitation. As shown by the image below, Sherrod contends that the ends of the products' absorbent layers are disposed within "elastically stretchable regions B and D" and that regions B and D (as generously outlined in green by Sherrod) are located in the products' front and back parts.[9] (Sherrod Decl. 15-16; Sherrod Decl. Ex. B-14, at 4).

---

[9] SCA-AP-004 mirrors SCA-AP-001 and the SCA's contentions as to each product are the same.



First Quality contends that based on the teachings of the '646 Patent and its file history, "[o]ne of ordinary skill in the art at the time of the alleged invention would have logically understood that the 'front part' is the part of the diaper facing forward of the wearer and defined

by its side edges . . . and the 'back part' is the part of the diaper placed rearward of the wearer and defined by its side edges . . . ." (Defs.' Mot. Partial Summ. J. 23). An image demonstrating First Quality's proposed definitions is provided below with respect to SCA-AP-001.[10]



"It is a bedrock principle of patent law that the claims of a patent define the invention to which the patentee is entitled the right to exclude." *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312

[10] Significantly, First Quality's labels of the front, back, and crotch match precisely SCA's initial labelling of this product. (SCA's Infringement Contentions Ex. D, at 50, DN 83-7).

(Fed. Cir. 2005) (internal quotation marks omitted) (citation omitted).  The terms of a patent claim are generally to be given the ordinary and customary meaning from the perspective of a person of ordinary skill in the art at the time the patent is filed.  *Id.* at 1312-13.  "[T]he person of ordinary skill in the art is deemed to read the claim term not only in the context of the particular claim in which the disputed term appears, but in the context of the entire patent, including the specification."  *Id.* at 1313.  When construing claim terms, a court should first look to the intrinsic evidence, such as the patent itself and its file history.  *See id.* at 1313-15.  "[T]he claims themselves provide substantial guidance as to the meaning of particular claim terms."  *Id.* at 1314 (citation omitted).  The claims, however, cannot be viewed in insolation, as "'[t]hey are part of a fully integrated written instrument,' consisting principally of a specification that concludes with the claims."  *Id.* at 1315 (quoting *Markman*, 52 F.3d at 978).

As the Federal Circuit has repeatedly recognized, "the specification is always highly relevant to the claim construction analysis.  Usually, it is dispositive; it is the single best guide to the meaning of a disputed term."  *Vitronics Corp. v. Conceptronic*, 90 F.3d 1576, 1582 (Fed. Cir. 1996); *Metabolite Labs., Inc. v. Lab. Corp. of Am. Holdings*, 370 F.3d 1354, 1360 (Fed. Cir. 2004) ("In most cases, the best source for discerning the proper context of claim terms is the patent specification wherein the patent applicant describes the invention."); *Merck & Co. v. Teva Pharms. USA, Inc.*, 347 F.3d 1367, 1371 (Fed. Cir. 2003) ("[c]laims must be construed so as to be consistent with the specification, of which they are a part."  (citations omitted)).  In *Renishaw PLC v. Marposs Società per Azioni*, 158 F.3d 1243 (Fed. Cir. 1998), the Federal Circuit noted that:

> Ultimately, the interpretation to be given a term can only be determined and confirmed with a full understanding of what the inventors actually invented and intended to envelop with the claim.  The construction that stays true to the claim

language and most naturally aligns with the patent's description of the invention will be, in the end, the correct construction.

*Id.* at 1250 (internal citation omitted) (citation omitted).

Additionally, a patent's prosecution history "can often inform the meaning of the claim language by demonstrating how the inventor understood the invention and whether the inventor limited the invention in the course of prosecution, making the claim scope narrower than it would otherwise be." *Phillips*, 415 F.3d at 1317 (citation omitted). A patent's prosecution history, which the Federal Circuit considers intrinsic evidence, "[c]onsists of the complete record of the proceedings before the PTO and includes the prior art cited during the examination of the patent." *Id.* (citation omitted).

As noted above, the parties dispute the meaning of the terms "front part" and "back part" primarily as they pertain to the disposed within limitation of claim 15. Both terms, however, are used throughout the '646 Patent. While "[i]n some cases, a claim term can be given a different meaning in various claims of the same patent, when a patent so provides," the general rule is that "[a] word or phrase used consistently throughout a patent claim should be interpreted consistently." *CAE Screenplates, Inc. v. Heinrich Fielder Gmbh & Co. Kg*, 224 F.3d 1308, 1317 (Fed. Cir. 2000); *Phonometrics, Inc. v. N. Telecom, Inc.*, 133 F.3d 1459, 1465 (Fed. Cir. 1998). The Court finds that the terms front and back part are used consistently throughout the patent, so its analysis will focus on claim 15.

Claim 15 begins by provides, in relevant part,

In an absorbent pants-type diaper which is intended for one-time use only and which comprises: a front part having side edges and an end edge; a back part having side edges and an end edge; a crotch part between the front and back parts; at least two side-closure parts which mutually join parts of the side-edges of respective front and back parts, so that the pants-type diaper will present a waist opening and two leg openings . . . .

U.S. Patent No. 6,375,646 col. 10, ll. 6-14.  At the outset, the language of claim 15 indicates that the "front part" and "back part" of the pants-type diaper taught by the '646 Patent are both defined by their edges.  *Id*.  In detailing the dimensions of the diaper, claim 15 describes the dimensions of the diaper's front and back parts by reference to side and end edges.  *Id*.  The specification further supports this finding in describing the front and back parts of the diaper taught by the '646 Patent.

> The pants-type diaper includes a front-part 1, which is intended to be placed forwardly on the wearer, a back-part 2, which is intended to be placed rearwardly on the wearer, and a crotch-part 3 which is located between the front and the back parts 1, 2 and which is intended to be placed between the thighs of the wearer.  . . . Each of the front and the back parts have two side-edges 4, 5 and one end-edge 6, 7.

*Id.* at col. 5, ll. 46-52, 55-57.

Like the language of claim 15, the specification describes the dimensions of the front and back parts of the diaper by reference to the side and end edges.  *Id.* at col. 5, ll. 55-57.  It further clarifies that "[n]o precise limits can be drawn between the respective parts and the size relationships there between can vary . . . ."  *Id.* at col. 5, ll. 51-54.  This language explains that a diaper could still be covered by the '646 Patent even if its front part, for example, was larger than what is depicted in Figure 1; it does not change the fact that the front and back parts of the diaper are defined by reference to their side and end edges in claim 15, the description, and throughout the '646 Patent.  *See, e.g.*, *id.* at col. 8, ll. 48-51.  Additionally, the specification explains as follows:

> As will be seen from FIG. **3**, when the pants-type diaper is in its assembled or ready-to-wear state, the diaper has a waist opening **9** between respective end-edges **6, 7** of the front and the back parts, and two leg openings **10, 11** *which are surrounded by respective side edges 8 of the crotch-part*.  Respective side-edges **4** of the front-part are joined to corresponding respective side-edges **5** of the back-part, such that the pants-type diaper will present two side-closure parts **12, 13**

*which extend from the waist opening **9** to respective leg openings **10, 11** on respective sides of the diaper.*

*Id.* at col. 5, ll. 58-67 (emphasis added).[11]

From this, it follows that the side and end edges define the front and back of the diaper and that the side edges of the crotch (i.e., the tops of the leg openings of the assembled product) define the upper limits of the crotch. Stated another way, the front and back parts end where the leg openings begin; the crotch ends where the side edges of the front and back are joined at the point furthest from their end edges.

Moreover, the prosecution history of the '646 Patent indicates that, before SCA served revised infringement contentions, they agreed that the front and back parts of the diaper taught by the '646 Patent are defined by their edges. During reexamination, SCA defined the front part of the diaper disclosed in the prior art ("Watanabe Patent") by its side edges and end edge. (Claim Construction Mem. Op. & Order 11). As can be seen by the image below from Watanabe, SCA considered regions A-D to be the diaper's front part. (Claim Construction Mem. Op. & Order 11 (recognizing that SCA stated during reexamination that, "Areas A-D constituted

---

[11]



FIG. 3

the entire front of the *Watanabe et al.* diaper.")).  Region A begins at the diaper's end edge, while region D ends where the diaper's side edge terminates.



In light of this intrinsic evidence, the Court defines the phrase "front part" as the part of the diaper facing forward on the wearer; beginning at its end edge and ending where its side edges terminate.  Similarly, the Court defines the phrase "back part" as the part of the diaper facing rearward on the wearer; beginning at its end edge and ending where its side edges terminate.

The opinion of SCA's expert does not change this conclusion.  When construing claim terms, "extrinsic evidence in the form of expert testimony can be useful to a court for a variety of purposes . . . ."  *Phillips*, 415 F.3d at 1318.  That being said, extrinsic evidence is generally "less reliable than the patent and its prosecution history in determining how to read claim terms."  *Id.* Expert testimony is particularly less reliable because it "is generated at the time of and for the purpose of litigation and thus can suffer from bias that is not present in the intrinsic evidence." *Id.*  As a result, "conclusory, unsupported assertions by experts as to the definition of a claim term are not useful to a court."  *Id.*

As stated above, Sherrod defines the phrase "front part" as, "[t]he portion of the product located between the side seams and generally extending from the waist to the beginning of the crease of the leg on the front of the wearer's body, and the phrase "back part" as, "[t]he portion of the product located between the side seams and generally extending from the waist to the end of the curve of the buttocks on the back of the wearer's body."  (Sherrod Decl. 10).  Sherrod fails, however, to explain how a person of ordinary skill in the art would arrive at these subjective definitions.  Indeed, he points to no language from the '646 Patent to support his proposed definitions; as such, they are not useful to the Court.

When the front and back parts of SCA-AP-001 and 004 are properly defined, First Quality's labelling of SCA-AP-001 is accurate; SCA's labelling is incorrect, as reflected in Exhibit D-1 shown on page 59.  Thus, the areas labeled by SCA as elastically stretchable regions B and D fall within the products' crotch parts—defined in claim 15 and throughout the '646 patent as the area "between the front and back parts[,]" at least upon examination of the two-dimensional images submitted by the parties.  These images clearly reflect that the thigh elastic transecting the absorbent pad is in the crotch portion of the diaper.  The pad itself abuts but does not extend into the front and minimally extends into the back, but is disposed there in an area without any elastic.

That being said, after the hearing on this motion and review of SCA's supplemental brief, the Court recognizes that the location of regions of B and D is less apparent when viewing the actual products in their assembled state.  Regardless, even if the thigh elastics extended into the front or back parts, the end parts of the products' absorbent layers would still not be disposed within an elastically stretchable region.  As shown by the image below, using the revised "front," "side," and "crotch" labels, Sherrod contends that the ends of the products' absorbent layers are

disposed within "elastically stretchable regions B and D" because the front end parts of the products' absorbent layers "extend into" region B and the rear end parts of the products' absorbent layers "extend into" region D; he further opines that regions B and D are located in the products' front and back parts. (Sherrod Decl. 15-16; Sherrod Decl. Ex. B-14, at 4, DN 107-37).[12]

---

[12] SCA-AP-004 mirrors SCA-AP-001 and the SCA's contentions as to each product are the same.



While SCA has massaged what it considers to be the ordinary meaning of "disposed within" a number of times, the Court finds instructive SCA's first representation of the phrase's ordinary meaning. In its opening claim construction brief, SCA explained that "the words in this

phrase are clear on their face[,]" and "[o]ne skilled in the art reading the patent in the context of the claimed invention would readily understand that an end part of the absorbent layer must be located (or terminate) within the elastically stretchable region." (Pls.' Opening Claim Construction Br. 26, DN 53). SCA confirmed this position in its supplemental brief by stating that "disposed within" means "placed within or located in something . . . ." (Pls.' Suppl. Br. 13). Again, an elastically stretchable region is "an area bounded by elastic elements/material incorporating a continuous number of elastic elements/material that is capable of being stretched." SCA "[d]isclaimed any interpretation of 'elastically stretchable region(s)' . . . as including considerable areas of non-elastic material that are not covered by elastic elements or materials, i.e. gaps." (Claims Construction Mem. Op. & Order 12). Even if regions B and D constituted elastically stretchable regions, and were in the front and back parts of the products, the end parts of SCA-AP-001's and 004's absorbent layers are not located *within* them. Instead, regions B and D contain three elastic strands, transecting a small portion of the end parts of the products' absorbent layers, while a large portion of the end parts extends beyond the three strands and terminates in areas devoid of elastic. In fact, the gap of no elastic beyond the three strands extends roughly halfway toward the end edges of the front and back. Sherrod's attempt to equate the pad's extension across the three-strand area with the patent requirement that the pad be disposed within an elastically stretchable area is rejected. In light of the meaning of the phrase elastically stretchable region, the Court fails to see how any reasonable jury could conclude that SCA-AP-001 and 004 literally meet the disposed within limitation based on Sherrod's opinion alone. As a result, summary judgment of non-infringement is appropriate with respect to SCA-AP-001 and 004.

### 3. *Design 3 Products*

SCA accuses SCA-AP-010 of infringing claims 1 and 15 as well as various dependent claims of the '646 Patent. Sherrod explains that the Design 3 products have elastically stretchable regions in their front parts which extend from their waist parts to the bottom of the front parts. (Sherrod Decl. 17). These elastically stretchable regions are primarily comprised of an elastically stretchable laminate material, but also contain approximately three elastic strands located at the bottom of their front parts and in their waist parts. (Sherrod Decl. 17-18). Sherrod opines that one of ordinary skill in the art visually inspecting the Design 3 products would determine that their absorbent layers are disposed within these elastically stretchable regions, which cover essentially the whole of the products' front parts. (Sherrod Decl. 34). Specifically, based on his inspection of SCA-AP-010, Sherrod asserts that "the front end part of the pad/absorbent layer of [SCA-AP-010] extends into the elastically stretchable region which covers almost all of the front part." (Sherrod Decl. Ex. B-15, at 3, DN 107-38). His annotated version of SCA-AP-010 is produced below and illustrates his opinion:



Exhibit F-1
SCA-AP-010

Meanwhile, First Quality's expert opines that the Design 3 products do not meet the disposed within limitation. (Gardner Decl. 12-15). Gardner explains in his declaration that "the portion of elastic laminate material that overlaps with the absorbent pad is not stretchable, since

the elastic property of the film has been rendered ineffective" as a result of being glued to the underlying material. (Gardner Decl. 11). He further notes that this area is known in the industry as a "deactivated region," and that Sherrod testified in his deposition that gluing is a method of deactivating elastics. (Gardner Decl. 11).

Unlike the Design 1 and 2 products, Sherrod has not admitted that any portion of the elastic laminate material found in the front part of the Design 3 products is deactivated. While Sherrod testified in his deposition that gluing is generally a method of deactivating elastics, he has since clarified that the area over the Design 3 products' absorbent layers can still be physically stretched and that the "region still has substantial elasticity despite the limited deactivation caused by the glue." (Sherrod Dep. 595:20-25; Sherrod Suppl. Decl. 4). As a result, there is a genuine dispute of material fact as to whether the elastic material in the front parts of the Design 3 products where the end parts of the absorbent layers are disposed has been deactivated to such a degree that it can no longer be considered part of an elastically stretchable region.

There is also a genuine dispute of material fact as to whether the essentially the whole limitation is met. First Quality offers the opinion of its expert and the following image of SCA-AP-020, a Design 1 product, as support for the conclusion that a "significant portion" of the front part of SCA-AP-010 does not contain any elastic material and that no reasonable jury could find infringement. (Gardner Decl. 16).



This single image is not as decisive as First Quality maintains. SCA-AP-020 and 010 are completely different products; they are not even in the same design category. Compare the diagram of SCA-AP-020 above with the diagram of SCA-AP-010, which is the preceding diagram. As to SCA-AP-010, First Quality's expert declares that "the portion of elastic laminate material that overlaps with the absorbent pad is not stretchable, since the elastic property of the film has been rendered ineffective" as a result of being glued to the underlying material. (Gardner Decl. 11). Sherrod, however, disagrees and claims that the region can still be physically stretched and that it "still has substantial elasticity despite the limited deactivation caused by the glue." (Sherrod Suppl. Decl. 4). As discussed above, there is a genuine dispute as to whether this portion of the elastic laminate material can no longer be considered part of an elastically stretchable region. Therefore, summary judgment of non-infringement as to SCA-AP-010 is inappropriate both as to claims 1 and 15.

## IV.    CONCLUSION

For the reasons outlined above, **IT IS HEREBY ORDERED** as follows:

1.    First Quality's Motion to Exclude Portions of the Expert Report of Earle Sherrod Relating to Infringement and for Summary Judgment of Non-Infringement (DN 96) is **DENIED**.

2.     First Quality's Motion to Exclude Portions of Expert Reports of Earle Sherrod & Richard Gering Relating to Commercial Success (DN 97) is **DENIED IN PART** and **DENIED AS MOOT IN PART**.

3.     SCA's Motion to Preclude Expert Testimony of Daniel D. Gardner, Jr. on the Issue of Infringement of the Patent-in-Suit (DN 100) is **DENIED**.  However, the parties shall confer within 14 days and attempt to resolve Gardner's failure to answer the disputed questions, after which point the Court will schedule a telephonic conference with the parties.  If the parties are unable to resolve the issue, as First Quality maintains is possible, First Quality shall produce Gardner for further deposition on the questions he refused to answer and reasonable follow-up questions.  If further deposition is necessary, the costs of the deposition, including the fee of the court reporter, the transcript of the deposition, and attorneys' fees incurred in taking the deposition, not merely preparing for it, shall be borne by First Quality.  SCA's counsel shall submit to the Court, and serve upon First Quality' counsel, a statement of the above costs.  First Quality's counsel will then have 14 days to show cause why he should not be required to pay the costs submitted.

4.     First Quality's Motion for Partial Summary Judgment of Non-Infringement (DN 98) is **GRANTED IN PART** and **DENIED IN PART**.  Summary judgment of non-infringement is **GRANTED** as to SCA-AP-020, SCA-AP-050, SCA-AP-056, SCA-AP-016, SCA-AP-051, SCA-AP-001, and SCA-AP-004 and **DENIED** as to SCA-AP-010.

**Greg N. Stivers, Judge**
**United States District Court**
April 7, 2017

cc:     counsel of record